908 F.2d 1565
 Joseph Bernard JUDGE, as personal representative of the
estate of Laura Jeanne Weingartner Judge, a/k/a
Laura Jeanne Judge, Plaintiff-Appellant,
v.
AMERICAN MOTORS CORPORATION, Jeep Corporation, and American
Motors Sales Corporation, Defendants-Appellees.
 No. 89-3698.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 21, 1990.
 
 1
 John P. Graves, Jr., Sarasota, Fla., for plaintiff-appellant.
 
 
 2
 David R. Tyrrell, Hill, Ward, Henderson, Tampa, Fla., Rodger Kesley, Baker, Worthington, Crossley, Stansberry & Woolf, Nashville, Tenn., for defendants-appellees.
 
 
 3
 Appeal from the United States District Court for the Middle District of Florida.
 
 
 4
 Before CLARK, Circuit Judge, RONEY*, Senior Circuit Judge, and ATKINS**, Senior District Judge.
 
 ATKINS, Senior District Judge:
 
 5
 This is an appeal from two dispositive district court orders. In the first order, the district court concluded that because the substantive law of Mexico controlled the appellant's claim for wrongful death, the appellant could not pursue that claim. In the second order, the district court held as a matter of law that the appellant's claim for misleading and deceptive advertising could not be maintained. For the following reasons, we VACATE the district court's first order and REMAND that portion of the case for further proceedings. We AFFIRM summarily the district court's second order.
 
 A.
 
 6
 Facts and Background Information.
 
 
 7
 In September, 1987, the appellant, his wife, and David and Beverly Smith flew from Florida to Mexico for a vacation. All four were Florida residents. When the vacationers arrived in Mexico, they rented a Jeep CJ-7 vehicle from a local rental company. On September 7, 1987, while travelling south from Cancun, Mexico, the vacationers' rented vehicle allegedly swerved to the right. When Mr. Smith, the driver, tried to steer the vehicle back to the left, the vehicle allegedly started to roll over. The vehicle then went out of control, swerved across the road, and collided with an oncoming vehicle. The appellant's wife and Mr. Smith died in the collision.
 
 
 8
 The appellant thereafter filed the present action for wrongful death in the Middle District of Florida. The amended complaint named as defendants American Motors Corporation, Jeep Corporation, and American Motors Sales Corporation (collectively, "the appellees"). Although they are incorporated in various states, all three appellees have their principal place of business in Michigan. The record reveals that pursuant to their ordinary course of business, the appellees designed and manufactured Jeep-type vehicles, including the CJ-7 line of vehicles. The particular vehicle involved in the present case was manufactured and assembled in Mexico by a Mexican corporation, Vehiculas Automotores Mexicanos, S.A. ("VAM"). VAM was, from October, 1983 until August, 1987, a wholly-owned subsidiary of appellees American Motors Corporation and Jeep Corporation. VAM is not now, and has never been, a party to the present action.
 
 
 9
 The gist of the appellant's amended complaint is that the appellees designed the CJ-7 line of vehicles in a defective, unreasonably dangerous manner.[1] Specifically, the appellant seeks compensatory and punitive damages on the theory that the CJ-7 vehicles, including the vehicle the appellant rented in Mexico, "experienced handling, control and stability problems ... by virtue of their design characteristics." Amended Complaint, para. 10(a). The record reveals that although the appellant's vehicle was assembled to accord generally with the CJ-7 design specifications formulated by the appellees, VAM, in assembling the vehicle, did not adhere strictly to the appellees' design specifications. See Kieb Depo., R1:9 & 63-64 (noting that appellant's CJ-7 had different roll bars, wheels, trims, and the like). The record does not, however, reveal whether the design specifications formulated by the appellees or the deviations undertaken by VAM constituted the proximate cause of the appellant's wife's death. See infra Sec. B(2) (conflict-of-laws analysis focuses in part on place where the conduct causing the injury occurred).
 
 
 10
 After the parties completed discovery, the appellees filed a motion for summary judgment. The motion asserted that under Florida's conflict-of-laws principles, the district court was required to apply Mexican substantive law to the appellant's wrongful death claim. Because Mexican law does not recognize a cause of action for wrongful death, the appellees argued that the court was obligated to dismiss the appellant's wrongful death claim. In response, the appellant argued that Florida substantive law controlled the claim. Because Florida law does recognize causes of action for wrongful death, the court, the appellant argued, was obligated to deny the appellees' motion and proceed to trial on the merits.
 
 
 11
 The district court granted the appellees' motion. The court first recited that Mexico does not recognize causes of action for wrongful death. Pursuant to Florida's conflict-of-laws principles, the court then analyzed whether Mexico or Florida had the most "significant relationship" with the appellant's wrongful death claim. At the close of this analysis, the court concluded that Mexico had the most significant relationship. The court therefore applied the substantive law of Mexico and dismissed the appellant's claim. Final Judgment was entered shortly thereafter. This appeal followed.
 
 B.
 
 12
 Discussion.
 
 
 13
 1. Florida's Conflict-of-Laws Principles.
 
 
 14
 The present conflict-of-laws analysis begins with certain core principles. Because the appellant filed this diversity action in the Middle District of Florida, we must look to Florida's conflict-of-laws rules to resolve the present dispute. Trans Caribbean Lines, Inc. v. Tracor Marine, Inc., 748 F.2d 568, 570 (11th Cir.1984) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). These rules are set forth in Bishop v. Florida Specialty Paint Co., 389 So.2d 999 (Fla.1980). In Bishop, the Florida Supreme Court abandoned the strict doctrine of lex loci delicti and held that conflicts questions, including those which involve questions of tort, should henceforth be decided with reference to the principles delineated in the Restatement (Second) of Conflicts of Laws (1971) (hereinafter, "Restatement (Second)"). Bishop, 389 So.2d at 1001; see also State Farm Mut. Auto. Ins. Co. v. Olsen, 406 So.2d 1109 (Fla.1981) (reaffirming Florida's adherence to Restatement (Second) test); Garcia v. Public Health Trust of Dade County, 841 F.2d 1062, 1064 (11th Cir.1988) (in conflict-of-laws inquiry, court must determine whether "the specific issue at hand [is] a problem of law of contracts, torts, property, etc." and then "determine what choice of law rule the state ... applies to that type of legal issue") (quoting Acme Circus Operating Co., Inc. v. Kuperstock, 711 F.2d 1538, 1540 (11th Cir.1983)). Section 145 of the Restatement (Second) provides:
 
 
 15
 Section 145: The General Principle.
 
 
 16
 (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in Sec. 6.
 
 
 17
 (2) Contacts to be taken into account in applying the principles of Sec. 6 to determine the law applicable to an issue include:
 
 
 18
 (a) the place where the injury occurred;
 
 
 19
 (b) the place where the conduct causing the injury occurred;
 
 
 20
 (c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and
 
 
 21
 (d) the place where the relationship, if any, between the parties is centered.
 
 
 22
 These contacts are to be evaluated according to their relative importance with respect to the particular issue.
 
 
 23
 (emphasis added).[2] Section 6 of the Restatement (Second) provides in turn:
 
 
 24
 Section 6: Choice-of-Law Principles.
 
 
 25
 (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
 
 
 26
 (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:
 
 
 27
 (a) the needs of the interstate and international systems;
 
 
 28
 (b) the relevant policies of the forum;
 
 
 29
 (c) the relevant policies of the other interested states and the relative interests of those states in the determination of the particular issue;
 
 
 30
 (d) the protection of justified expectations;
 
 
 31
 (e) the basic policies underlying the particular field of law;
 
 
 32
 (f) certainty, predictability and uniformity of result; and
 
 
 33
 (g) ease in the determination and application to the law to be applied.
 
 
 34
 The courts have formulated few hard-and-fast rules to guide the application of these principles. It is true, on the one hand, that "[t]he state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law." Bishop, 389 So.2d at 1001. But it is equally true that "the state where the injury occurred may have little actual significance for the cause of action," and that "[o]ther factors may combine to outweigh the place of injury as a controlling consideration." Id. Conflict-of-laws questions thus cannot be resolved by reciting general pronouncements; to determine which sovereign has the "most significant relationship" to a particular issue, a court must instead examine the facts and circumstances presented in each particular case. See Stallworth v. Hospitality Rentals, Inc., 515 So.2d 413, 418 (Fla.Dist.Ct.App.1987) (after declining to apply law of state in which injury occurred, court states that decision is "necessarily limited to the specific facts of this appeal") (emphasis added); see also Garcia, 841 F.2d at 1064 (final step in analysis is to "apply the proper choice of law rule to the instant facts and thereby conclude which [jurisdiction's] substantive law applies") (quoting Acme Circus, 711 F.2d at 1540).
 
 
 35
 2. Identification of Interested Sovereigns.
 
 
 36
 To discharge the analysis mandated by the Restatement (Second), we must first determine which sovereigns have interests in applying their laws to the present dispute. See Restatement (Second) Sec. 145(2). First, Florida has an interest in applying its laws because the appellant is a Florida resident. Id. Sec. 145(2)(c). Second, Michigan has an interest in this proceeding because all three appellees have their principal place of business in that state. Id. Sec. 145(2)(c).[3] Michigan will also retain an interest if the conduct which caused the appellant's wife's injury occurred there. Restatement (Second) Sec. 145(2)(b); see also supra Sec. A (no finding as to which party's conduct caused injury). Finally, Mexico has an interest by virtue of its being the place where the injury occurred and the place where the relationship between the parties is centered. Id. Secs. 145(2)(a), 145(2)(d). Mexico might also retain an interest to the extent that the conduct which caused the injury occurred there. Id. Sec. 145(2)(b). Section 145(2) therefore reveals that Florida, Michigan, and Mexico all have interests in applying their respective laws to the present dispute.
 
 
 37
 3. Evaluation of Competing Interests.
 
 
 38
 Having identified the three interested sovereigns, we must now determine which sovereign's interest is the most "significant." To discharge this task, we cannot simply add up the factors delineated in section 145(2) and then apply the law of the sovereign with the greatest numerical total. See Foster v. United States, 768 F.2d 1278, 1281 (11th Cir.1985) (noting that "it is not the state with greatest number of contacts but with the most significant contacts whose law will govern as to that particular issue"); R. Leflar, L. McDougal & R. Felix, American Conflicts Law 383 (4th ed. 1986) (cautioning that conflicts analysis must not "descend to a mere counting of factual contacts, to see which state has the most"). Rather, we must, as mandated by section 145(1), turn to the factors delineated in section 6 to determine which sovereign has the most significant contact. See O'Connor v. O'Connor, 201 Conn. 632, 519 A.2d 13, 23 (1986) (to "resolve standoff" between interested states, court refers to relevant factors set forth in section 6(2)).[4]
 
 
 39
 (a) Balance of Competing Policy Considerations under Sections 6(2)(b) and 6(2)(c).
 
 
 40
 The section 6(2) analysis turns in large part on the balance of competing interests contemplated by sections 6(2)(b) and 6(2)(c). To perform this analysis, the court must first identify the particular rule of law sought to be applied by each interested state. The court must then identify the purposes or policies which underlie each state's rule of law. See Restatement (Second) Sec. 6 comment e (noting that "[e]very rule of law, whether embodied in a statute or in a common law rule, was designed to achieve one or more purposes"); see also id. Sec. 145 comment c (stating that "the interest of a state in having its tort rule applied ... will depend on the purpose sought to be achieved by that rule").
 
 
 41
 In the final step of the section 6(2)(b)-6(2)(c) analysis, the court must assess the degree to which the purposes underlying each rule would be furthered by the rule's application. See Restatement (Second) Sec. 145 comment e (where more than one state has legitimate interest in application of its rule, court must determine whether "[the forum state's] interest in the application of its rule outweighs the countervailing interest of [the other interested state]"). As a general proposition, "it is fitting that the state whose [policy] interests are most deeply affected should have its local law applied." Restatement (Second) Sec. 6 comment f (emphasis added); see also Foster, 768 F.2d at 1284 (court applies Illinois law where policy considerations which underlie that state's rule will be more significantly furthered than policy considerations which underlie Florida's rule); Scoles & Hay, Conflict of Laws 604 (1984) (court must ultimately "apply the rule of the state whose policy interests has the greater significance or whose policy interests is most appropriately furthered by the subordination of the policy of the other state").[5]
 
 
 42
 With these principles in mind, we must first examine the interests held by Florida, the forum state. The relevant Florida rule of law permits certain survivors to recover compensatory and punitive damages for wrongful death. See Fla.Stat.Ann. Secs. 768.16-.27 (West 1986). The purpose of this rule is to afford survivors a vehicle through which they can shift the burden of loss from themselves to the wrongdoer. See id. Sec. 768.17 (describing statute's remedial policy). In the present case, the Florida appellant seeks a forum in which he can sue the appellees for their allegedly defective automobile design. Clearly, then, the purpose of Florida's wrongful death rule will be significantly furthered if Florida's substantive law is applied to this case. Accordingly, we conclude that section 6(2)(b) militates "weightily" in favor of Florida law. See Restatement (Second) Sec. 6 comment e (stating that "[i]f the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made").
 
 
 43
 Pursuant to section 6(2)(c), we must next examine the interests held by Michigan. One of Michigan's rules of law provides that parties may recover compensatory damages in wrongful death actions. This provision is, however, qualified by the general limitation that plaintiffs who prevail in any Michigan lawsuits cannot recover punitive damages. See, e.g., Jackovich v. General Adjustment Bureau, Inc., 119 Mich.App. 221, 326 N.W.2d 458, 464 (1982) (Michigan does not permit award of damages "solely to punish or to make an example of a defendant because of the malice or recklessness with which he acted") (quoting American Central Corp. v. Stevens Van Lines, Inc., 103 Mich.App. 507, 303 N.W.2d 234 (1981)). These rules reflect several policy considerations. First, Michigan, like Florida, wishes to afford wronged parties a vehicle through which they can seek compensation. Second, by permitting actions for wrongful death, Michigan wishes to regulate and deter dangerous conduct that occurs in the state. See Southerland & Waxman, Florida's Approach to Choice-of-Law Problems in Tort, 12 Fla.St.U.L.Rev. 447, 475 n. 123 (1984) (rules which regulate conduct "apply to all persons acting within the state"); see also Chicago Air Crash, 644 F.2d at 613 (where state is corporation's principal place of business, state has interest in deterring corporation's tortious conduct). Finally, Michigan's punitive damage prohibition is informed by the economic desire to "encourage socially useful enterprise by relieving entrepreneurs from what the legislature regards as an oppressive risk of liability." B. Currie, Selected Essays on the Conflict of Laws 704 (1963). Michigan therefore has a strong interest in applying its rules to the present dispute: its first policy will be advanced because the appellant will be afforded a forum to litigate his claim; its third policy will be advanced because the appellant seeks a punitive damage award; and its second policy will be advanced if the Michigan appellees in fact formulated a defective automobile design.[6]
 
 
 44
 We turn finally to Mexico. The only rule sought to be applied by Mexico provides, as noted above, that litigants cannot maintain any actions for wrongful death.[7] This wrongful death rule appears to express two policy considerations. First, the rule might reflect Mexico's desire to reduce the number of cases filed in its local courts. In the case at bar, however, the appellant filed his action in Florida, not Mexico. Accordingly, any administrative purpose which underlies Mexico's wrongful death rule would not be advanced by the application of Mexican law to the facts of the present case. See Restatement (Second) Sec. 145 comment c (reason for abolishing cause of action for particular tort might be to "spare the local courts from the burden of having to hear such actions").
 
 
 45
 Mexico's wrongful death rule might also reflect an economic policy consideration. Mexico's rule, as noted above, completely immunizes certain in-state activities from the chilling effect of adverse damage awards. Mexico thus might seek through its rule to "encourage socially useful enterprise" within the country's borders. See supra Sec. B(3)(a) (describing economic policy). The crucial question, then, is whether, on the facts of this particular case, Mexico's economic policy will be advanced by the application of its wrongful death prohibition. See Currie, supra at 703 (where state adopts policy eliminating liability for wrongful death, court must ask: "In what circumstances will the state have an interest in applying that policy?").
 
 
 46
 The Supreme Court of California addressed a similar question in Reich v. Purcell, 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727 (1967) (Traynor, C.J.). The Reich dispute arose out of a car accident in Missouri. The complaint charged that the defendant, a California resident, had negligently operated his vehicle, thereby causing it to collide with the Ohio plaintiff's vehicle. The plaintiff's wife died in the crash. The Court had to determine whether damages should be assessed under Ohio law for the full amount of the plaintiff's injuries or whether damages should, pursuant to Missouri's wrongful death rule, be limited to $25,000.[8]
 
 
 47
 To determine whether to apply the law of Missouri or Ohio, the Reich Court carefully scrutinized the nature and the purpose of Missouri's wrongful death rule. The Court first found that where Missouri residents were plaintiffs in wrongful death actions, Missouri had an interest in applying its rule in order to "determin[e] the distribution of proceeds to the [specified] beneficiaries." Reich, 63 Cal.Rptr. at 35, 432 P.2d at 731. The Court next found that where Missouri residents were joined as defendants in wrongful death actions, Missouri again had an interest in applying its rule so that it could shield its residents from "the imposition of excessive financial burdens." Id. But where Missouri residents were not in any way involved in wrongful death actions, Missouri retained only a slight interest in applying its wrongful death rule. The Court summarized this reasoning in the following manner:
 
 
 48
 Missouri is concerned with conduct within her borders and as to such conduct she has the predominant interest of the states involved. Limitations of damages for wrongful death, however, have little or nothing to do with conduct. They are concerned not with how people should behave but with how survivors should be compensated. The state of the place of the wrong has little or no interest in such compensation when none of the parties reside there.
 
 
 49
 Id. 63 Cal.Rptr. at 34-35, 432 P.2d at 730-731 (emphasis added); accord O'Connor, 519 A.2d at 24 (despite fact that injury and wrongful conduct occurred there, Quebec, under Restatement (Second) test, had no interest in applying its insurance limitation rule to negligence action by Connecticut plaintiff against Connecticut defendant); Harris v. Berkowitz, 433 So.2d 613, 615 (Fla.Dist.Ct.App.1983) ("All parties to this [wrongful death] action are permanent residents of Florida. It is therefore impossible to ascertain any policy Maine might have in the application of its limitation on damages...."). The Reich Court thus found that despite its being the place of the injury and the place of the wrongful conduct, Missouri had no real interest in applying its wrongful death rule to the dispute between the Ohio plaintiff and the California defendant. Accordingly, the Court held that the parties' rights and liabilities were to be governed by Ohio law. Id. 63 Cal.Rptr. at 35, 432 P.2d at 731.[9]
 
 
 50
 With these principles in mind, we turn again to the facts of the present case. First, no Mexican plaintiffs are joined in this action. Mexico therefore has no interest in distributing estate proceeds or benefits to its residents. Second, and more importantly, no Mexican entities have been joined as defendants. This being the case, no "socially useful enterprise" undertaken by Mexican residents stands to be chilled by the spectre of a large, adverse damage award. The application of Mexico's wrongful death rule thus will not significantly further the economic purposes which underlie that rule. Accordingly, we conclude pursuant to section 6(2)(c) that Mexico has only a slight interest in applying its wrongful death rule to the present case.
 
 
 51
 In making this determination, we acknowledge that although there are no Mexican residents joined to the present action, Mexico may well wish to encourage foreign corporations to bring their business to Mexico. To achieve this end, Mexico might wish to extend the economic benefits of its wrongful death rule not just to Mexican residents, but also to foreign corporations that are attempting to determine whether or not to do business in Mexico. See Currie, supra at 704 (sovereign "quite possibly" retains interest in applying damage limitation rule to foreign corporations doing business in the state). But this "foreign investment interest"--plausible though it may be--is not seriously threatened on the facts of the present case. To envision any interest-triggering harm to the Mexican sovereign, we will have to assume that there exists a causal link between the economic benefits of Mexico's wrongful death rule and the corporate decision to do business there. More specifically, Mexico's interest in attracting American investment is threatened only if we assume that once American tourists are permitted to maintain wrongful death actions for design-related accidents occurring in Mexico, American investors will, notwithstanding Mexico's other economic advantages, withdraw their resources from the Mexican marketplace. There exists no evidence in the record to support these assumptions; without such evidence, we deem the assumptions too strained to merit serious weight under section 6(2)(c). We therefore reaffirm that the purposes underlying Mexico's wrongful death rule will not be significantly advanced by the rule's application to the present facts.
 
 
 52
 (b) Further Considerations under Section Six.
 
 
 53
 Having concluded that the balance contemplated by sections 6(2)(b) and 6(2)(c) tips away from the Mexican rule, we must now examine the other relevant provisions of section 6(2).[10] Foremost among these is section 6(2)(a). See Restatement (Second) Sec. 6 comment d (noting that "[p]robably the most important function of choice-of-law rules is to make the interstate and international systems work well"). Section 6(2)(a), as noted above, provides that the conflicts analysis must be guided partly by the needs of the interstate and international systems. Along these lines, the district court observed that the application of any law other than Mexico's would, in the present case, work adverse effects on the international commercial system. See Order (M.D.Fla. 88-0937-Civ-T-13C) (June 5, 1989), at 11 (also noting that "[t]he stability of the interstate and international systems would be severely undermined if a state or nation succeeded in imposing its laws and its standards on all other states and nations").
 
 
 54
 The foregoing assessment overstates the extent to which the present facts implicate international considerations. This case, as noted above, is essentially a domestic dispute. In it, a United States plaintiff sues three United States defendants in a United States court for the tortious acts committed by the United States defendants. The appellant's claims do not in any way involve Mexican individuals, Mexican corporations, or conduct which occurred in Mexico. Beyond Mexico's barely-implicated "foreign investment interest," then, see supra Sec. B(3)(b) (describing desire to attract foreign investment), this case has very little to do with relations between the United States and Mexico. Stated slightly differently, this is simply not an instance in which United States law is intrusively "exported" to control the rights and liabilities of a dispute that involves aliens. Compare with Boxer v. Gottlieb, 652 F.Supp. 1056, 1063 (S.D.N.Y.1987) (where French law precludes vicarious liability claim based on negligence, application of New York law to vicarious liability claim against French corporation would constitute an "improper intrusion ... into the laws of another jurisdiction").[11] Thus, while United States courts should certainly resolve conflicts disputes with a respectful regard for the needs of the international community,[12] such considerations are, at best, only peripherally implicated on the facts of the present case. Accordingly, we conclude that section 6(2)(a) does not militate significantly in favor of Mexican law.
 
 
 55
 We turn finally to the concerns which imbue section 6(2)(f) of the Restatement (Second). That section, as noted above, urges the application of the rule of law which will foster "certainty, predictability and uniformity of result;" and it can, in the present case, be plausibly maintained that because the appellant's collision occurred in Mexico, the application of Mexican law would best advance the purposes of section 6(2)(f). See Order (M.D.Fla. 88-0937-Civ-T-13C) (June 5, 1989), at 12.
 
 
 56
 We agree that section 6(2)(f)'s benefits militate in favor of the application of Mexican law; but we are reluctant to purchase these benefits "at too great a price." Restatement (Second) Sec. 6 comment i; see also id. (stating that "it is often more important that good rules be developed than that predictability and uniformity of result should be assured through continued adherence to existing rules"). Other courts have--albeit impliedly--evinced a similar reluctance. In In re Air Crash Disaster Near New Orleans, 789 F.2d 1092 (5th Cir.1986) (hereinafter, "New Orleans Air Crash "), for example, several Uruguayan passengers were killed in an airplane accident in Louisiana. Their survivors filed a wrongful death action against the United States airline in the Eastern District of Louisiana. In the first two claims, two of the plaintiffs sued for the wrongful deaths of their parents; in the third and fourth claims, plaintiff Pampin sued for the deaths of his mother and sister; and in the fifth claim, Pampin sued for the death of his aunt. The issue was whether Uruguayan law or Louisiana law controlled the five claims.
 
 
 57
 Equitable considerations dominated the Fifth Circuit's analysis. After concluding that the plaintiffs' first four claims were controlled by Louisiana law,[13] the court had to determine which sovereign's law controlled Pampin's claim for the death of his aunt. The application of Louisiana law clearly would have fostered predictability and uniformity: this selection would not only have employed the law of the state in which the injury occurred, but it would also have determined all five claims under the law of a single sovereign. Nevertheless, the court observed that because Louisiana did not recognize a cause of action for a nephew's wrongful death claim, the application of Louisiana law would foreclose Pampin's claim entirely. See New Orleans Air Crash, 789 F.2d at 1097 (stating that "Louisiana law provided no remedy [for a nephew's wrongful death action]; the law of Uruguay did"). The court obviously deemed it more important to avoid this harsh result than to foster predictability: the court therefore held flatly that Uruguayan law would control Pampin's claim for the death of his aunt. Id.
 
 
 58
 This reasoning applies with equal force to the facts of the present case. If the law of either Florida or Michigan is applied, the appellant will be permitted to seek some type of remedy for the death of his wife. If, however, Mexican law is applied, the appellant's claim will be completely foreclosed in both this country and Mexico. Compare with Boxer, 652 F.Supp. at 1064 (court notes that New York plaintiff is not completely barred from recovery and may, inconvenience notwithstanding, seek a remedy under French law); Avis Rent-a-Car Sys., 517 So.2d at 27 (plaintiff permitted to seek remedy in Cayman Island court under Cayman Island law). We believe that the equitable interest in avoiding Mexico's complete prohibition is at least as important as the institutional interest in promoting predictability and uniformity. We therefore conclude that in this particular case, the section 6(2)(f) benefits do not, when balanced against the countervailing equitable considerations, lend significant weight to the application of Mexican law.[14]
 
 C.
 
 59
 Conclusion.
 
 
 60
 We hold that on the particular facts of this case, Mexico's relationship to the appellant's wrongful death claim is less significant than either Florida's relationship or Michigan's. This holding rests on several findings. First, whereas the policy considerations which underlie Mexico's wrongful death rule will be only slightly advanced by the rule's present application, the considerations which underlie Florida's or Michigan's rule will be significantly advanced. The balance of competing policy interests contemplated by sections 6(2)(b) and 6(2)(c) thus tips decisively away from Mexican law. See supra Sec. B(3)(a). Finally, the other relevant factors set forth in section 6(2) do not strongly favor Mexican law: this case only peripherally implicates relations between the United States and Mexico, and the "predictability benefits" yielded by the application of Mexican law do not, when viewed against the harsh backdrop of complete foreclosure, militate significantly in favor of the appellees' position. See supra Sec. B(3)(b).
 
 
 61
 We therefore vacate the district court's conflict-of-laws order and remand this case for further proceedings. The court shall, upon remand, determine whether Florida or Michigan has the most significant relationship to appellant's wrongful death claim. This determination shall be based on the principles articulated in the Restatement (Second); the determination shall not be based on the appellant's "global contacts" theory. We affirm the district court's disposition of the misleading advertising claim.
 
 
 62
 RONEY, Senior Circuit Judge, concurring in part and dissenting in part:
 
 
 63
 I concur in the court's decision affirming the summary judgment on the false advertising claim. I respectfully dissent from the remand to the district court to decide whether Florida law or Michigan law should apply, for the reasons set forth in the Order of the district court, a portion of which is attached hereto as an Appendix.
 
 
 64
 This accident took place in Mexico in a rented vehicle manufactured by a Mexican corporation subject to Mexican design specifications. The rental agreement was negotiated and executed in Mexico by the plaintiff Florida resident with a Mexican company. The car was owned by a Mexican corporation, registered and licensed for use in Mexico. Once the false advertising allegations are dismissed, the only contact this case has with Florida is that the plaintiff lives here. To hold that defendants would be liable under the laws of any of the fifty states in which a plaintiff injured in a foreign country might happen to reside completely discounts any policy that uniform and predictable rules should be applied to a given transaction.
 
 
 65
 The possibility that Michigan law should apply seems better to me. The complaint alleges that the assembly and marketing of the vehicle by the Mexican corporation was under the supervision and control of the defendants pursuant to design specifications created and provided by the defendants. The defendants are a Maryland corporation, a Nevada corporation, and a Delaware corporation, all with their principal place of business in Michigan.
 
 
 66
 Without the advertising claim, the basic allegation of fault is that the vehicle went out of control due to "inherent hazardous design characteristics." The Jeep was assembled under defendants' design standards "which they knew resulted in inherently hazardous handling, control and stability characteristics" and which they knew were not crashworthy and were unsafe. Presumably this activity took place in Michigan.
 
 
 67
 It would seem, however, that when an American company's subsidiary in a foreign country manufactures machinery for use there, it should at most suffer only that liability which the foreign law imposes upon it and all other manufacturers of like products. American companies should be able to compete abroad on an even playing field with non-American companies. To increase their costs by subjecting them to liability which their competitors do not suffer prevents them from doing just that.
 
 
 68
 In my judgment, the district court correctly applied Florida's conflict-of-law principles.
 
 APPENDIX
 UNITED STATES DISTRICT COURT
 MIDDLE DISTRICT OF FLORIDA
 TAMPA DIVISION
 
 69
 Joseph Bernard Judge, as the personal representative of the
 
 
 70
 estate of Laura Heanne Weingartner Judge, a/k/a
 
 
 71
 Laura Jeanne Judge, Plaintiff,
 
 
 72
 v.
 
 
 73
 American Motors Corporation, a Maryland corporation; Jeep
 
 
 74
 Corporation, a Nevada corporation; and American
 
 Motors Sales Corporation, a Delaware
 
 75
 corporation, Defendants.
 
 Case No. 88-937-CIV-T-13C
 
 76
 June 6, 1989.
 
 ORDER
 
 77
 The defendants' motion for summary judgment is granted in part and denied in part for the reasons set forth herein.
 
 
 78
 Plaintiff, Joseph Judge, brings this diversity action as the personal representative of his deceased wife Laura Judge. Laura died in Mexico on September 9, 1987 when the rented jeep in which she was riding overturned.[1] The complaint presents three counts: negligence, strict liability and "punitive conduct" against three defendants: American Motors Corporation ("AMC"), Jeep Corporation ("Jeep"), and the American Motor Sales Corporation ("AMSC").[2] The plaintiff alleges the three were part of a "family of companies" which included a "Mexican entity" used to manufacture, assemble and market jeeps in Mexico which failed to meet design standards prevalent in Florida and other states.[3] In the instant motion, defendants move for summary judgment on the ground that Mexican law applies to this case and that it precludes plaintiff from the recovery he seeks. The plaintiff stipulates that, if Mexican law applies, "then clearly ... [there is] no cause of action or right of recovery." Brief in Opposition, at 10.[4] Consequently, choice of law is the preeminent issue. Since the material facts which are in dispute cannot be resolved in a manner which would compel the application of Florida law to plaintiff's claims for strict liability, negligence and "punitive conduct," summary judgment is warranted against each of those claims.
 
 
 79
 Summary judgment is appropriate when the Court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.C.P. 56(c). The moving party has the burden of establishing the absence of a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, that burden extends only to facts that might affect the outcome of the suit under the governing law. "Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). Once this burden is met the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Celotex Corp., 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. The plaintiff has stipulated that Mexican law entitles him to no recovery; the only relevant issue is whether Mexican law applies. Nonetheless, plaintiff has submitted tens of pounds of evidentiary materials in opposition to the motion--the vast majority of which is wholly irrelevant to the choice of law question. Evidence is weighed by relevance, not tonnage. The Court has determined that Mexican law governs the primary issues in this case. Consequently, summary judgment is forthcoming.
 
 
 80
 A federal district Court is bound to apply the conflict of laws rules prevailing in the forum state. Trans Caribbean Lines, Inc., et al. v. Tracor Marine, Inc., et al., 748 F.2d 568 (11th Cir.1984) citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1447 (1941). Thus, Florida's choice of law rules will apply. Florida's seminal decision is found in Bishop v. Florida Specialty Paint Co., 389 So.2d 999 (Fla.1980), wherein its Supreme Court adopted the "significant relationships test," as set forth in the Restatement (Second) of Conflicts of Law Sec. 145 and Sec. 146 (1971). Section 145 provides in part:
 
 
 81
 (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in Sec. 6 (emphasis added).
 
 Section 6 directs the court to consider:
 
 82
 (a) the needs of the interstate and international systems,
 
 
 83
 (b) the relevant policies of the forum,
 
 
 84
 (c) the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue,
 
 
 85
 (d) the protection of justified expectations,
 
 
 86
 (e) the basic policies underlying the particular field of law,
 
 
 87
 (f) certainty, predictability and uniformity of result, and
 
 
 88
 (g) ease in the determination and application of the law to be applied.
 
 Section 145 concludes:
 
 89
 (2) Contacts to be taken into account in applying the principles of Sec. 6 to determine the law applicable to an issue include:
 
 
 90
 (a) the place where the injury occurred,
 
 
 91
 (b) the place where the conduct causing injury occurred,
 
 
 92
 (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
 
 
 93
 (d) the place where the relationship, if any, between the parties is centered.
 
 
 94
 These contacts are to be evaluated according to the relative importance with respect to the particular issue.
 
 Section 146 adds:
 Personal Injuries
 
 95
 In an action for personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in Sec. 6 to the occurrence and the parties, in which event the local law of the other state will be applied.[5]
 
 
 96
 Most importantly, Florida courts apply the "most significant relationship" test, not to a collective sum of issues in dispute, but to each individual issue which arises in the case. Stallworth v. Hospitality Rentals, Inc., 515 So.2d 413, 415 (Fla. 1st DCA 1987), citing Hertz v. Piccolo, 453 So.2d 12 (Fla.1984), et al. Thus the law of a foreign state may control one issue while the law of Florida controls another. Id. citing Foster v. United States, 768 F.2d 1278 (11th Cir.1985). The first step in the analysis, therefore, is to determine what issue is in dispute.
 
 
 97
 The issue in dispute in the instant case is not the amount of damages recoverable nor the degree of negligence which makes an error actionable; the issue in dispute in the instant case is whether a cause of action ever arose against the defendants.[6] The defendants move to dismiss on the ground that no cause of action has arisen against them. The plaintiff opposes with reference to tort actions which have purportedly arisen under Florida law. Under Florida law, however, a tort arises in the jurisdiction where the last act necessary to establish liability occurred. Meehan v. Celotex Corp., 466 So.2d 1100, 1106 (Fla. 3rd DCA 1985) [citing Colhoun v. Greyhound Lines, Inc., 265 So.2d 18, 21 (Fla.1972) and quoting Ester, Borrowing Statutes of Limitation and Conflict of Laws, 15 U.Fla.L.Rev. 33, 47 (1962) ], rev'd on other grounds, Celotex Corp. v. Meehan, 523 So.2d 141 (Fla.1988); Colhoun v. Greyhound Lines, Inc., 265 So.2d 18 (Fla.1972). The accident occurred in Mexico. Clearly, none of the claims plaintiff asserts had arisen prior to that event. Thus the primary actions in tort arose, if at all, in Mexico. The question presented is whether Florida law can apply to a tort which arose in another state. Bishop answered in the affirmative; but that response begs the follow up: under what circumstances?
 
 
 98
 Bishop is the vehicle through which Florida's Supreme Court subrogated the inflexible rule of lex loci delicti, to the more modern "significant relationships test." Bishop, 389 So.2d at 1000-01. Instead of blindly applying the law of the place of injury, Bishop held that courts should apply the law of the state with the most significant relationship to the relevant issue [see above]. Bishop involved Florida residents who rented a plane from a Florida company and then hired a Florida pilot to fly them from Florida to North Carolina and back. The plane crashed, en route, in South Carolina. The plaintiffs sued the company and the pilot in tort. Invoking the lex loci delicti, the trial court granted summary judgment to the defendants based on plaintiffs' inability to meet the tougher negligence standard of South Carolina law. The district court affirmed but certified to the Florida Supreme Court the question of whether the lex loci delicti rule governed in all circumstances without regard for the state's policy or its relationship to the parties.
 
 
 99
 The Florida Supreme Court answered in the negative and noted that the place of injury was fortuitous, the relationship between the place of injury and the parties was tenuous and the interest of South Carolina in the suit was negligible. On the other hand, the suit involved Florida plaintiffs and Florida defendants who entered into a Florida contract in order to secure transportation which was to begin and end in Florida. Florida had an interest in protecting its citizens as well as regulating its businesses and enforcing against them the standards of care enacted by the Florida legislature. Consequently, the Court adopted that part of the Restatement (Second) of Conflict of Laws reprinted above, and held that the suit would be governed by Florida law. The Court was careful to note, however, that:
 
 
 100
 [t]he conflicts theory set out in the Reinstatement does not reject the 'place of injury' rule completely. The state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law (emphasis added).
 
 
 101
 Id. at 1001. Indeed, a recent federal decision concluded that "[a] survey of the Florida cases applying the 'most significant relationship' test suggests that the law of the state in which the injury occurred will almost always govern the issue in dispute (cite omitted) (emphasis added)." Florida Steel Corp. v. Whiting Corp., 677 F.Supp. 1140, 1141 (M.D.Fla.1988). It is presumed that the law of the place of injury governs substantive issues until another state is shown to have a more compelling interest. See Peoples Bank and Trust Co. v. Piper Aircraft Corp., 598 F.Supp. 377, 379 (S.D.Fla.1984); see also Emmart v. Piper Aircraft Corp., 659 F.Supp. 843-44 (S.D.Fla.1987).
 
 
 102
 The instant plaintiff cites several cases wherein Florida courts applied the law of state A to torts which arose in state B. In each of those cases, however, both the plaintiff[s] and the defendant[s] were residents of State A, or did substantial business in state A which resulted in the relationship between the parties. See e.g., Proprietors Ins. Co. v. Valsecchi, 435 So.2d 290 (Fla. 3rd DCA 1983) (following Bishop and applying Florida law where Florida residents crashed, in another state, in a plane rented from a Florida company for a trip which was to begin and end in Florida); Andrews v. Continental Ins. Co., 444 So.2d 479 (Fla. 5th DCA 1984) (applying Maine law in a contract dispute between Maine residents which arose out of a contract executed in Maine even though the accident happened in Florida); State v. Burke, 447 So.2d 233 (Fla. 2nd DCA 1983); Krasnosky v. Meredith, 447 So.2d 232 (Fla. 1st DCA 1983) (applying Florida's guest host law to an action arising out of a one car accident in Georgia where both occupants were Florida residents, the driver's insurance policy was issued by a South Carolina company authorized to do business in Florida and the trip began and was to end in Florida).[7] Notably, this Court concluded in Florida Steel Corp. v. Whiting Corp., 677 F.Supp. 1140 (M.D.Fla.1988) that "Florida courts do not apply the law of the state where the injury occurred if all parties and several significant events are connected with another state (emphasis added)." Id. at 1141. While this assertion does not exclude other possibilities it does help to define the extent of the exception thus far.
 
 
 103
 Unlike the cases cited above, the instant defendants are incorporated in three different states and have their principal places of business in a fourth. Although the plaintiff maintains that each does business in Florida, the plaintiff also maintains that each does business in Mexico. Brief in Opposition, at 19. Most significantly, the relationship between the plaintiff and the defendants did not arise out of their Florida ventures: the vehicle was rented in Mexico, not Florida. Thus the primary if not sole tie to Florida is the residence of the plaintiff.[8] The only other possible tie relates to the extent of the defendants' advertising in Florida. Since the plaintiff asserts he relied, in part, on advertising he had seen in Florida, the Court must accept the assertion as fact regardless of the defendants' claim that plaintiff relied solely on Mexican advertisements. Brief in Support, at 8. However, the existence of advertising within the state is insufficient to overcome the concentration of party ties in Mexico for purposes of choosing which law governs the issues of strict liability and negligence. Claims relative to false advertising will be addressed below.
 
 
 104
 In contrast, the place of injury was Mexico and it cannot be said to be fortuitous. The vehicle was manufactured by a Mexican corporation [which the plaintiff chose not to include as a party] making it subject to Mexican design specifications. The rental agreement was negotiated and executed in Mexico; it was between a Florida resident and a Mexican company and it concerned a vehicle owned by a Mexican company and registered and licensed for use in Mexico.[9] The relationship between parties is not only centered in Mexico, it is virtually confined to it. The only reason that all of the parties are U.S. citizens is that the plaintiff opted to exclude the "Mexican entity" from his suit. Even so, the greater weight of the factors for consideration listed in the Restatement (Second) compels this Court to apply Mexican law to the primary issues of strict liability and negligence. The stability of the interstate and international systems would be severely undermined if a state or a nation succeeded in imposing its laws and its standards on all other states and nations. What the plaintiff is suggesting is that Florida's legislature should not only enact laws which it sees fit to protect Florida residents, but that it should seek to cloak each one of its domiciliaries with the full extent of that protection anywhere in the world. While this might sound idyllic in theory, it could prove chaotic in practice.
 
 
 105
 The protection of justified expectations is an important element in the choice of law analysis. When a company seeks to do business in a foreign state or country it anticipates subjection to the laws and customs of the territory. The cost of compliance, like the cost of labor, taxes and tariffs, is factored into the company's decision to operate therein. Likewise, the country or state in which a company operates has an interest in attracting business within its borders. Thus countries and states design legal structures which, in the minds of those in power, balance their interest in protecting consumers with their interest in attracting jobs and commerce. Application of a state's laws to events which arise within that state's borders and involve that state's residents and its visitors promotes certainty, predictability and uniformity of result. The alternative is to impose the legal structure of one state on the operations of another and to saddle its domiciliaries with the obligations of both.
 
 
 106
 These overlapping legal impositions would make increasingly difficult all corporate efforts to evaluate the costs of foreign operation (whether in another state or another country). Moreover, it would deprive those states and countries of their right to fashion the legal structures they find most appropriate. The curtailment of foreign practices would not cease with the Florida legislature but would extend to innumerable legislative bodies of innumerable other states, provinces, countries, etc., until all governmental units were restrained by the standards of the most draconian among them. This is not to suggest that the lex loci delicti remains intact, but that it remains as a primary factor to be considered and not lightly to be set aside. Its harshness is abated by the decision to set it aside when an injury occurs in a state having no interest in the precipitating event or any of its participants, and where another state has a substantial interest in the event and in all of its participants. The underlying logic is to protect justified expectations by applying "home law" to "home parties," provided there is a "home state's" law to apply. The logic which underlies both the rule and its exception would be confounded if the forum state imposed its laws against domiciliaries of three different states for the benefit of one of its citizens who was injured in a foreign country by reason of a rental agreement with a foreign domiciliary having no relation to the forum whatsoever save for the residency of the customer/plaintiff.
 
 
 107
 The Restatement (Second) does not contemplate such a result. The plaintiff admits as much when he abandons state delineations to advocate a novel application of the Restatement (Second) which he terms "The Global Concept."[10] In effect, he asks the Court to analogize states with countries for conflict of law purposes, to the end that all of the parties to this action are U.S. citizens, therefore the U.S. has an interest, Mexico does not and, although the accident happened there, it would be better to try it here--in any American court and, more particularly, in a court of the plaintiff's choosing:
 
 
 108
 Defendants have brought into issue only a comparison of the contacts ... of the Plaintiff and companions [sic] with the Republic of Mexico and the State of Quintana Roo ... on the one hand[,] to the State of Florida on the other[,] to the almost complete exclusion of the United States.
 
 
 109
 The issue here is on an international level and although the 'choice of law' decisional law [sic] is equally applicable the scope is much more broad. Just as the United States of America, the Republic of Mexico is [sic] a federal state in the global sense. The USA and Mexico both have states; in Mexico the State of Quintana Roo is involved; in the USA the States of Florida and Michigan are involved. States in the USA have counties and Mexican states have counterparts called municipalities.... Finally, there are cities within the US counties and Mexican municipalities.
 
 
 110
 The point to be made here is that although we certainly shouldn't ignore the interests of and contacts with the national states, i.e., Quintana Roo and Florida, significant consideration should be given to contacts, policies and interests of the international states, the republics, i.e. Mexico and the good old United States of America--....[11]
 
 
 111
 Brief in Opposition, at 9. Plaintiff goes on to:point out that all of the parties are citizens of the United States of America, all parties are citizens of and reside in or do business in the State of Florida [sic] and numerous significant events are connected with both the United States of America and Florida, which we will discuss below. Id. at 10.
 
 
 112
 Despite the promise, the plaintiff fails to "discuss below" any significant events which transpired in Florida, save for the allegedly significant defendant advertising. Instead, he focuses on the significant events which allegedly took place in the U.S., i.e., designing, testing and manufacturing of the vehicle--all of which the defendants deny but which the Court must accept for the purposes of this motion. Absent adoption of plaintiff's "Global Concept," the fact that the vehicle was designed, manufactured, tested and rented in states other than Florida counsels against the application of Florida law to the instant suit. It dilutes the significance of events which transpired in Florida and makes their concentration in Mexico appear all the more striking.[12] The plaintiff's strategy is to erase state boundaries, not to mention state sovereignty, long enough for the Court to compare contacts between Mexico and, as he puts it, "the good old [U.S. of A.]," and then to reimpose those boundaries when the Court compares the contacts between American states. Thus, in the plaintiff's mind, the contacts within the U.S. (manufacture, design, residence of each party, etc.) and the policies which underlie its protection of citizens, outweigh any Mexican interests; and, once confined to U.S. borders, Florida law is more logically applied to this case than that of any other state.
 
 
 113
 The plaintiff's theory suffers from three primary shortcomings. It is not supported by precedent. It is unlimited in extent (i.e., it can be invoked by forum shopping plaintiffs who wish to avail themselves of the laws of any particular governing body--city, county, state, nation, hemisphere, world [?]--without any consideration for the legitimate expectations of defendants). And it is proffered, as a new approach, within a legal framework designed to achieve certainty, predictability and uniformity of result. Moreover, the plaintiff chooses not to recognize that America's national interests are factored into the current state of the law: American law allows American states to select the choice of law rules they wish to apply. Florida has done so, and the instant plaintiff seeks to undo that decision, not because it defeats American interests, but because it defeats his own.
 
 
 114
 Most recently, this Court considered a case remarkably similar to the instant one and determined that it was controlled by Mexican law. In Shaffer v. AMC, et al., Case No. 87-1212-CIV-T-10A, plaintiffs vacationing in Mexico rented a Jeep from Q.R. Rent-A-Car, S.A. The Jeep allegedly overturned while plaintiffs were travelling in Mexico and they sustained substantial injury. Plaintiffs filed suit under Florida law against Jeep Corporation, American Motors Sales Corporation and American Motors Corporation alleging negligent manufacture and design, false and deceptive advertising and strict liability. The Honorable William Terrell Hodges applied the most significant relationship test and concluded:
 
 
 115
 Plaintiffs' injuries were sustained in Mexico and that is where the alleged misconduct occurred. Mexico is also the locus of the parties' relationship as the vehicle was registered there, the rental agreement was signed there and the vehicle was driven there. The only factor weighing against the application of Mexican law is the domicile of the parties, none of whom resides or is incorporated in Mexico. Since the parties reside in various jurisdictions, however, this factor does not favor application of the law of any other specific jurisdiction.
 
 
 116
 Order dated May 24, 1988 at 7.[13] See also Avis Rent-A-Car Systems v. Abrahantes, 517 So.2d 25 (Fla. 3rd DCA 1987) (on which Judge Hodges relied).
 
 
 
 *
 See Rule 34-2(b) Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 As noted above, the appellant also asserted a claim for personal injuries flowing from the appellees' alleged misleading advertising in connection with the CJ-7 model vehicle. See Fla.Stat.Ann. Sec. 817.41 (West 1977). The district court held that the statute applied to consumers deceived in the course of commercial transactions, not to personal injury plaintiffs. We affirm without opinion the district court's decision to dismiss this claim, see 11th Cir.R. 36-1, and limit the following discussion to the wrongful death/conflict-of-laws issue
 
 
 [2]
 We note that both section 145's general rule and section 175's specific wrongful death rule refer the court to the principles delineated in section 6. See Restatement (Second) Sec. 175 (court should apply law of state in which injury occurred "unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in Sec. 6 to the occurrence and the parties") (emphasis added)
 
 
 [3]
 In In re Air Crash Disaster Near Chicago, 644 F.2d 594 (7th Cir.1981) (hereinafter, "Chicago Air Crash "), the plaintiffs' decedents were killed in an airplane crash. The plaintiffs alleged that one of the defendants, MDC Corporation, defectively designed and manufactured the airplane. MDC was a Maryland corporation. Id. at 604. MDC's principal place of business was Missouri, id., but it assembled the airplane in another state. For two reasons, the Seventh Circuit held that Missouri, as MDC's principal place of business, retained a strong interest in applying its law to the dispute. First, the court ruled that Missouri had an "obvious" interest in deterring the tortious conduct of its corporate residents, even where the conduct actually sued upon occurred in another state. Id. at 613. Second, the court stated that if Missouri was held not to have an interest in applying its law, then corporations could employ subterfuge to evade the substantive rules they find objectionable: the court feared that "[c]orporations ... would be encouraged to structure decisions so that no specific locus for a major decision could ever be proved to have occurred in a 'punitive [damage]' state." Id. at 614. This same reasoning demonstrates, in the present case, that Michigan cannot be excluded from the list of interested fora under section 145(2)
 
 
 [4]
 O'Connor and the present case are controlled by section 6(2 ) because neither the Connecticut legislature nor the Florida legislature has, pursuant to section 6(1 ), issued a statutory directive to guide conflicts disputes
 
 
 [5]
 Of course, a court should never apply the law of a state if the policy considerations which underlie that state's rule will not in any way be advanced by the rule's application. See Foster, 768 F.2d at 1283 (state's law should not be applied where application "advances no [underlying] policy"); O'Connor, 519 A.2d at 24 (Quebec law should not be applied where "[t]he policies behind Quebec's no-fault rule would not be furthered by application of Quebec law in the circumstances of the present case"); Scoles & Hay, supra at 603 (where "the policy underlying one of the potentially applicable rules calls for its application, while the application of the competing rule would not serve to further any policy underlying that rule," court should apply rule of former state)
 
 
 [6]
 In a conflict-of-laws inquiry, the fact that one state has the greatest interest in applying its punitive damage rule to a particular dispute does not necessarily mean that the same state will have the greatest interest in applying its compensatory damage rule. See Restatement (Second) Sec. 145 comment d ("Each issue is to receive separate consideration if it is one which would be resolved differently under the local rule of two or more of the potentially interested states."). Thus, in a comparison between Florida and Michigan, the question of which state retains the greatest interest in applying its punitive damage rule should be analyzed separately from the question of which state retains the greatest interest in applying its compensatory damage rule. See Emmart v. Piper Aircraft Corp., 659 F.Supp. 843, 846-47 (S.D.Fla.1987) (before analyzing punitive damage interests, court determines whether state of plaintiff's residence or state of one defendant's principal place of business has greatest interest in applying its compensatory damage rule)
 
 
 [7]
 Mexico does not seek to apply a rule that deters tortious in-state conduct because, as noted above, conduct undertaken in Mexico forms no part of the appellant's action. Compare Avis Rent-a-Car Sys. v. Abrahantes, 517 So.2d 25, 26 (Fla.Dist.Ct.App.1987) (American plaintiff alleges that Cayman Island defendant negligently failed to maintain vehicle at Cayman rental outlet)
 
 
 [8]
 The court discounted California's interest, noting that "since California has no limitation of damages, it also has no interest in applying its law on behalf of the defendant." Reich, 63 Cal.Rptr. at 34, 432 P.2d at 730 (emphasis added)
 
 
 [9]
 The Reich holding thus turns on the important distinction between "conduct-regulation" rules and "loss-distribution" rules. This distinction holds that where a conflicts dispute implicates a state's conduct-regulation rule (such as a rule of the road), a state's interest will usually be triggered whenever the regulated conduct or the injury occurs in the state. See Southerland & Waxman, supra at 475 n. 123; see also O'Connor, 519 A.2d at 23 (describing sovereign's interest in applying law which ensures proper use of its highways). But where a conflicts dispute implicates a state's loss-distribution rule (such as a limitation of damages), a state's interest is triggered not by the location of the injury/conduct but, rather, by the fact that the action joins the state's residents. See Southerland & Waxman, supra at 475 n. 123 & 477-78 (discussing Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963)); see also Currie, supra at 703 (where state seeks to apply wrongful death limitation rule, "the concern of the state is with the people involved rather than the scene of the activity") (emphasis added)
 
 
 [10]
 Although the Restatement (Second) provides that a court should generally apply the law of the state with the greatest interest under sections 6(2)(b) and 6(2)(c), see supra Sec. B(3)(a) (apply law of state "whose [policy] interests are most deeply affected"), the courts frequently consider section 6(2)'s other relevant factors in order to resolve conflicts disputes. See, e.g., Foster, 768 F.2d at 1282 (pursuant to section 6(2)(e), court examines "basic policies underlying the particular issue")
 
 
 [11]
 Indeed, the intrusiveness would fall entirely on Mexico's side if her laws were deemed to control a dispute to which none of her residents was joined. Cf. Asahi Metal Indus. Co. v. Superior Court of Solano County, 480 U.S. 102, 113-16, 107 S.Ct. 1026, 1033-35, 94 L.Ed.2d 92 (1987) (extraterritorial assertion of California's long-arm jurisdiction statute to control indemnity dispute between Japanese corporation and Taiwanese corporation would offend "traditional notions of fair play and substantial justice") (citation omitted)
 
 
 [12]
 The courts and commentators have, in other areas of the law, consistently emphasized the importance of international commercial considerations. See, e.g., Scherk v. Alberto-Culver Co., 417 U.S. 506, 516-17, 94 S.Ct. 2449, 2455-56, 41 L.Ed.2d 270 (1974) (refusal to enforce forum selection clause "would surely damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements"); Maier, Extraterritorial Jurisdiction at a Crossroads: An Interaction Between Public and Private Law, 76 Am.J.Int'l Law 280, 303 (1982) (to determine whether extraterritorial assertion of in personam jurisdiction is "reasonable," court must account for the United States' overarching interest in "maintaining jurisdictional rules that will support, ease and encourage international economic and social intercourse")
 
 
 [13]
 In that part of the analysis, the court emphasized not that the application of Louisiana law would "promote predictability" but, rather, that the Uruguayan plaintiffs stood to reap a greater monetary award under Louisiana law than under the law of their own country. See New Orleans Air Crash, 789 F.2d at 1097 (noting that "once it is determined that recovery under Louisiana law equals or exceeds that available under Uruguayan law, the interest of Uruguay recedes")
 
 
 [14]
 We reject summarily the contention that the appellees "justifiably expected" this case to be controlled by Mexican law. See Restatement (Second) Sec. 6(2)(d). First, there exists no evidence in the record to support the contention that the appellees' officers in fact held this expectation. Second, on an objective level, we simply do not believe that domestic corporations can "justifiably" expect lawsuits based solely on their own conduct to be controlled by the law of the countries in which their affiliates happen to be located. Cf. Chicago Air Crash, 644 F.2d at 613 (failure to account for interest of state in which corporation has principal place of business on ground that corporation assembles product in different state would "gut the very concept of corporate accountability")
 
 
 [1]
 The plaintiff takes issue with the defendants' practice of referring to the vehicle as a "jeep type vehicle," as opposed to referring to it as a "Jeep." The Court notes the conflict but, of course, can make no ruling relevant to it
 
 
 [2]
 Southfield, Michigan is the principal place of business for each of the defendants. AMC is incorporated in Maryland, Jeep in Nevada and AMSC in Delaware
 
 
 [3]
 The "Mexican entity" is not named as a defendant. Plaintiff maintains that the vehicle was rented by the operator from Budget Rent-A-Car, a U.S. company with its principal place of business in Cook County, Illinois. Complaint, par. 2 at 2
 
 
 [4]
 The Court notes the plaintiff's "hesitant" reliance on the defendants' characterization of Mexican law. Even so, the plaintiff chose to rely on that characterization expressly and offered nothing in evidence to contradict it. Brief in opposition, at 10. His stipulation undermines the subsequent assertion that it would not "go against the grain of Mexican policy" to provide a remedy in this situation. Id. at 19. If the "grain of Mexican policy" compelled a remedy, Mexican law would provide one
 
 
 [5]
 Similarly, Sec. 175 provides:
 Right of Action for Death. In an action for wrongful death the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in Sec. 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
 A wrongful death action "is derivative of the injured person's right, while living, to recover for personal injury." Celotex Corp. v. Meehan, 523 So.2d 141, 147 (Fla.1988) citing Variety Children's Hospital v. Perkins, 445 So.2d 1010 (Fla.1983).
 
 
 [6]
 The Court recognizes that the absence of a cause of action has grave consequences with regards to the amount of damages recoverable; this does not, however, change the fact that the issue in dispute is the existence of that cause of action and not the difference between the amount of damages it would provide under Florida law and the amount it would make available under Mexican law
 
 
 [7]
 See also Harris v. Berkowitz, 433 So.2d 613 (Fla. 3rd DCA 1983)
 
 
 [8]
 The plaintiff makes significant reference to cases wherein courts applied the law of the state from which a plaintiff left [i.e., on vacation] and to which he planned to return, instead of applying the law of the state where intervening injury occurred. These cases are distinguishable, of course, since, although the instant plaintiff's trip began and was to have ended in Florida, his relationship with the defendants materialized in Mexico where he rented the vehicle. That scenario is fundamentally different from those where a plaintiff from state A rents a plane in state A and then crashes in state B on his return trip to state A. The instant case would be analogous only if the plaintiff had rented his Jeep in Florida and driven it to Mexico with the intention of returning, in it, to Florida
 
 
 [9]
 The Court notes the plaintiff's claim that the vehicle was owned by an Illinois company and merely rented to a Mexican one. Complaint, par. 2 at 2. Instead of clarifying the choice of law question, this fact merely muddies the waters by the addition of an actor from yet another state
 
 
 [10]
 Plaintiff's awareness of the futility of his own position is further substantiated by his submission of a Banker's Box full of depositions and exhibits purportedly in opposition to summary judgment but largely irrelevant to the choice of law question on which summary judgment hangs
 
 
 [11]
 The plaintiff does not elaborate on the effect his theory would have on diversity jurisdiction or on a state's control over its counties and municipalities
 
 
 [12]
 Moreover, under Florida's strict liability law, the focus is on the unreasonably dangerous nature of the product, not on the defendant's conduct (i.e. manufacturing). See e.g., Whiting Corporation, 677 F.Supp. at 1141 ("Although Illinois is the state where the conduct causing the injury occurred, this factor is not significant in a products liability case." What the court found significant was the place of injury, the place of product delivery and the place of contract execution)
 
 
 [13]
 The instant plaintiff claims his case can be distinguished from Shaffer on factual as well as legal grounds but he fails to point out any facts or law which would make a difference to the choice of law inquiry. Brief in Opposition, at 24-25