[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-16659

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 10, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-20073 CV-UUB

GRUPO TELEVISA, S.A.,
TELEVISA, S.A. DE C.V.,
TELEVISO TALENTO, S.A. DE C.V.,

Plaintiffs-Appellants,

versus

TELEMUNDO COMMUNICATIONS GROUP, INC.,
TELEMUNDO TELEVISION STUDIOS, LLC,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 10, 2007)**

Before TJOFLAT, FAY and SILER,* Circuit Judges.

_____

*Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

FAY, Circuit Judge:

This appeal challenges a decision to apply Mexican law in a suit alleging tortious interference with a contract for the services of a Mexican soap opera star. The appellants (collectively "Televisa") are a trio of Mexican corporations that produce radio and television programs for Spanish-speaking audiences in Mexico and abroad. They license an American broadcaster, Univision, to carry their "telenovelas" or soap opera programs in the United States. The appellees (collectively "Telemundo") are rival Spanish-language television producers and broadcasters that are headquartered in Florida. After an actor who was under exclusive contract to Televisa accepted a role in a Telemundo soap opera, Televisa sued its American rival in federal district court in Miami, claiming tortious interference under Florida law.

Telemundo moved to dismiss the claim pursuant to Rule 12(b)(6), arguing that Mexican law, which does not recognize a cause of action for tortious interference, governed the dispute. Televisa urged the court to apply Florida law since the acts leading to the allegedly offensive conduct occurred in Florida. The district court denied Telemundo's motion to dismiss and ordered the motion converted to a motion for summary judgment. The court followed the choice of law rules of the forum state, which dictate that the court apply the law of the state

with the "most significant relationship" to the occurrence and the parties. Although the court declined to make a finding as to where the conduct causing the injury occurred, it found that other contacts favored the application of Mexican law, which would bar the claim. Accordingly, the court awarded Telemundo summary judgment, and Televisa filed an immediate appeal, challenging the court's "most significant relationship" calculus. For the reasons stated below, we vacate the district court's summary judgment decision and remand the case for trial under Florida's law of tortious interference.

## I. BACKGROUND

Grupo Televisa S.A., Televisa S.A., and Televisa Talento S.A. de C.V. (collectively, "Televisa"), are three closely affiliated Mexican corporations which produce Spanish-language television and radio programs for broadcast both in Mexico and abroad. Televisa also produces Spanish language periodicals and grooms many of the performers who appear in its productions for stardom, obtaining the rights to use their images and voices for promotional purposes. Televisa ranks as the largest producer of Spanish-language media in Central and Latin America, and it exports many television programs to the United States.

The United States represents an important market for "telenovelas," short serialized television dramas that are similar to American soap operas. Unlike

American soap operas, which attract daytime audiences, telenovelas air during prime-time viewing hours. Televisa maintains its international sales office in Florida, but it does not broadcast its telenovelas to the states directly. Instead, it licenses Univision Communications Group, Inc., a large Spanish-language broadcasting corporation, to carry its television programming in the U.S. on its networks, Univision and Telefutura. Together, these two networks command 80 % of the Spanish-language television market in the U.S. Televisa owns an unconsolidated equity interest in Univision.

Univision's chief rival for the attention of Spanish television audiences in the U.S. is the Telemundo Network, which is owned and operated by a subsidiary of the Telemundo Communications Group, LLC, which is itself a subsidiary of NBC Universal, Inc. Telemundo Communications Group, Inc. produces telenovelas through Telemundo Television Studios, LLC. Both Telemundo Communications Group, Inc. and Telemundo Television Studios, LLC are headquartered in Hialeah, Florida, which is where Televisa alleges that Telemundo committed tortious interference with one of its contracts.

The contract involved a Mexican actor named Juan Mauricio Islas Ilescas ("Islas"). On January 20, 2000, Islas signed an "Offering Letter" to Televisa. The Letter stated that Islas proposed to offer his services for "artistic interpretation" in

4

certain productions, "personal presentations" for promotional purposes, "voice interpretations in respect to any production" and "use of image" to Televisa on an exclusive basis for seven years. Islas proposed that all the aforementioned activities would be governed by a civil agreement and according to the Federal Copyrights Law of Mexico. Televisa accepted the offer on January 26, 2000, executing a "Framework Agreement for Rendering of Services on an Exclusive Basis" with Islas. Televisa had been grooming Islas as an actor since 1990 and had sent him to its acting school and cast him in a number of telenovelas.

The 2000 Framework Agreement contained a choice of law provision which stated that Mexican Federal Copyrights Law would govern the agreement. It also contained a penalty provision that stated Islas would owe Televisa P$840,000 in Mexican pesos in the event that he breached the terms of the agreement, and a separate penalty of P$5,880,000 in Mexican pesos should he breach his exclusiveness obligations under the agreement.

Additionally, Islas pledged that he would not render his services to any third party in Mexico or abroad for at least six months following termination of the agreement, should Televisa terminate the agreement early for breach. The Agreement also contained a first right of refusal provision that gave Televisa the right to match any third party offer that Islas might receive within six months of

5

the termination of the Agreement. In exchange for Islas' services, Televisa promised to pay him a monthly salary, separate payments for each telenovela, a lump sum towards the purchase of real property and yearly bonuses. Televisa and Islas modified the contract on April 1, 2001, on April 15, 2001, and once more on December 1, 2002, increasing Islas' compensation and the penalties for breach. In the interim, Televisa and Islas also executed four separate actors union agreements for specific telenovela projects.

On November 7, 2003, Mr. Islas, who was still under contract to Televisa, signed an exclusive production agreement with Telemundo at its offices in Hialeah, Florida. The Agreement stated that Telemundo engaged Islas to perform acting services in programs produced by Telemundo or third parties for use on Telemundo's network. The Agreement also contained an exclusivity provision in which Islas pledged that he "would not commence or participate in any negotiations for his services with, or render services for any third parties without Telemundo's prior written consent" during the term of the agreement. Emergency Motion for Temporary Restraining Order and Preliminary Injunction, January 20 & 22, 2004, Plaintiffs' Exhibit 3, at 2, § 3. The Agreement was to be binding until it was replaced by a long form agreement. *Id.* at 9, § 21.

On November 11, 2003, Mr. Islas and Telemundo signed a Conditional Deposit Agreement with the Banco Nacional de México, S.A., appointing the bank as the depository for a $1,000,000.00 payment from Telemundo to Islas. The Deposit Agreement authorized the bank to release the payment once Telemundo notified the bank that certain conditions obtained. The conditions that Telemundo sought to confirm were that:

> (i) any current services agreement which could limit the Artist's ability to render to Telemundo the services contemplated in the Services Agreement is terminated (either by final, non-appealable court order or by a valid and enforceable release from any party to any current services agreement to which the Artist is a party), and
> (ii) that the Artist does not have any other obligation that could limit his ability to render to Telemundo the services contemplated in the Services Agreement."

Emergency Motion for Temporary Restraining Order and Preliminary Injunction, January 20 & 22, 2004, Plaintiffs' Exhibit 4, at 4, ¶ D.

On December 17, 2003, Islas issued a press release in which he stated that he planned to leave Televisa. Televisa sent Telemundo a letter on January 5, 2004, informing them that Islas had an exclusivity contract which would run through January 2007. Televisa also notified Islas on January 6, 2004 that it planned to film a new telenovela beginning January 8th, and expected him to report for the taping. Islas did not report to Mexico for taping of Televisa's project on January 8th. Telemundo began filming the first project in which it planned to cast Mr. Islas

7

on January 12, 2004 at its studios in Hialeah. That same day Televisa filed suit against the Telemundo Communications Group, Inc. ("TCG") in federal district court in Miami, alleging tortious interference with contract. Televisa also requested a preliminary injunction to prevent TCG from using Islas's services through the duration of the Televisa-Islas contract. Televisa filed a separate motion for a temporary restraining order to keep TCG from moving forward with its plans for the Islas project, a telenovela which was billed as "La Prisionera."

According to Televisa, Telemundo held several meetings with Islas between September 2003 and November 2003 which culminated in the execution of the exclusive production agreement on November 7, 2003. The contacts that Telemundo had with Islas during the period from September 2003 through November 2003 consisted of the following:

- ▸ In late September 2003, Islas authorized his agent, David Vazquez, to meet with James McNamara, the President and Chief Executive Officer ("CEO") of TCG at TCG's offices in Florida.

- ▸ On October 1, 2003, the Director of Business and Legal Affairs for the Telemundo Network Group, LLC ("TNG"), Juan Delgado, drafted a non-binding letter of intent to Islas from his offices in Florida. The letter outlined the terms for a possible contract with Islas. Delgado faxed the agreement to TCG's President and CEO, James McNamara, who was to meet with David Vazquez, Islas' agent, at a hotel in Mexico City later that same day.

8

► TCG's President and CEO, James McNamara, and Ramon Escobar, the Executive Director of Programming and Production for TNG, met with Islas' representative, David Vazquez, at the Four Seasons hotel in Mexico City, Mexico on October 1, 2003.

► On October 3, 2003, Islas met directly with TCG's President and CEO James McNamara, TNG's Executive Director of Programming and Production, Ramon Escobar, and TNG's in-house counsel Delgado at the Mandarin Oriental Hotel in Miami, Florida. Islas' agent, David Vasquez, and two other Telemundo representatives were present as well.

► Sometime in early October 2003, TCG retained a Mexican attorney, Victor Frias, to advise them on Islas' exclusivity agreement with Televisa and any liabilities that Telemundo might incur under Mexican contract law should it engage Islas to appear in its productions while the Televisa contract was in effect.

► On October 10, 2003, TNG's in-house counsel, Juan Delgado, transmitted a draft of a proposed service agreement between Telemundo and Islas from his office in Miami to Islas's representative, David Vazquez, in Mexico City.

► In late October or early November of 2003, TNG's Executive Director of Programming and Production, Ramon Escobar, met with Islas directly at the Grand Bay Hotel in Miami.

► On November 7, 2003, Telemundo legal counsel Delgado and Frias, who were joined by Miami attorneys Rudolph Aragon and Dan Blonsky, participated in a conference call from Miami with Daniel Kummer, in-house counsel for NBC Universal Inc., which owns Telemundo. After the conference call, Kummer exchanged email messages with Aragon in Miami. Kummer also sent an email addressing the "'Pedro Smith' Talent Acquisition Issue" to various Telemundo representatives.

► Later that same day, on November 7, 2003, TNG's in-house counsel, Delgado, and TCG's Mexican counsel, Frias, met with Islas and his attorney, David Cohen, at TCG's offices in Florida. Islas and Telemundo entered into an agreement at TCG's offices in Florida.

9

▸ On November 11, 2003, Islas and Telemundo executed a "Conditional Deposit Agreement" with the Banco Nacional de México, S.A. which was to serve as a depository for the transfer of a $1,000,000.00 payment from Telemundo to Islas. The agreement states that the payment will issue once Telemundo confirms that Islas has no other existing obligations that will impact his ability to perform under the terms of the November 7 Agreement.

The court held a hearing on Televisa's request for a temporary restraining order on January 14, 2004. TCG objected to the temporary restraining order, insisting that it had not yet filmed any of the scenes in which Islas was to appear. The district court denied Televisa's request for a temporary restraining order, noting that the plaintiff had failed to establish irreparable harm.

Televisa filed an Amended Complaint against Telemundo in federal district court in Miami on January 21, 2004, adding Telemundo Television Studios, LLC ("TTS") as a defendant. The district court held a hearing on Televisa's request for a preliminary injunction on January 22, 2004. Although the court noted that Televisa had presented credible testimony that losing Islas from its roster of performers would result in "a substantial loss of audience and advertiser goodwill," the court ultimately denied the request. The court stated that Televisa had failed to show how an injunction would restore the lost goodwill or prevent additional irreparable losses before the court could adjudicate Televisa's claim. Order Denying Plaintiffs' Motion for Preliminary Injunction, January 27, 2004, at

10

17. Televisa filed an interlocutory appeal with the U.S. Court of Appeals for the Eleventh Circuit on January 29, 2004, challenging the district court's decision on this matter. This Court denied the appeal on August 26, 2004.

In the meantime, on February 9, 2004, Telemundo moved to dismiss Televisa's amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that Mexican law governed the dispute and that Mexican law did not recognize a cause of action for tortious interference. The court denied Telemundo's motion to dismiss on March 9, 2004, but issued a subsequent order on June 10, 2004, which stated that it would treat Telemundo's motion as a motion for summary judgment.

Televisa filed a Second Amended Complaint on September 27, 2004, adding a damage claim. On October 18, 2005, the court granted Telemundo's motion for case-dispositive summary judgment, applying Mexican law, which does not recognize an action for tortious interference. The court issued a final judgment for Telemundo on October 31, 2005.

Thereafter, Televisa filed a Notice of Appeal with the U.S. Court of Appeals for the Eleventh Circuit on November 25, 2005. Televisa also filed a separate intellectual property action before the court for the Federal District of Mexico to enjoin Islas from using his own name and likeness for commercial promotions.

11

Islas requested a declaratory judgment that his exclusivity contract with Televisa was void and unenforceable. Both actions remain pending in Mexico.

## II. STANDARD OF REVIEW

The decision to award the defendants summary judgment in this case turned on a conflict-of-laws issue —whether to apply Mexican law, which does not recognize an action for tortious interference with contract, or Florida law, which does. A conflict-of-laws issue presents a legal question which appellate courts review *de novo*. *American Family Life Assurance Co. v. United States Fire Co.*, 885 F.2d 826, 830 (11th Cir.1989); *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1514-15 (11th Cir. 1997).

However, the district court had to make certain factual findings before it resolved the conflict-of-laws issue in favor of Mexican law. We review the court's factual findings under a clearly erroneous standard, assuring ourselves that the findings are supported by substantial credible evidence. See Fed. R. Civ. P. 52(a); *see also Fioretti v. Massachusetts Gen. Life Ins. Co.*, 53 F.3d 1228, 1230 n.4 (11th Cir. 1995) (applying the clearly erroneous standard of review to the factual findings underpinning a choice-of-law decision).

Finally, we review the district court's ruling on a motion for summary judgment *de novo*, adhering to the same legal standards that bound the district

12

court. *National Fire Insur. Co. of Hartford v. Fortune Const. Co.*, 320 F.3d 1260, 1267 (11th Cir.), *cert. denied*, 540 U.S. 873 (2003). Rule 56(c) of the Federal Rules of Civil Procedure provides that a district court should grant summary judgment if the record, including pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, fails to disclose any genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *National Fire Insur. Co.*, 320 F.3d at 1267. As we review the record on a motion for summary judgment, we draw all reasonable inferences that can be sustained by the record and evaluate those inferences in the light most favorable to the non-moving party. *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999).

### III. DISCUSSION

*A. Choice of Law Rules for Federal Courts Sitting in Diversity*

A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). As a preliminary matter, the court must characterize the legal issue and determine whether it sounds in torts, contracts, property law, etc. Once it has characterized the legal issue, it determines the choice of law rule that the forum state applies to

13

that particular type of issue. *Acme Circus Operating Co., Inc. v. Kuperstock*, 711 F.2d 1538, 1540 (11th Cir. 1983).

Florida resolves conflict-of-laws questions according to the "most significant relationship" test outlined in the Restatement (Second) of Conflict of Laws. *Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999, 1001 (Fla. 1980). The Restatement (Second) of Conflict of Laws provides a "General [Tort] Principle" in section 145 that is intended to inform courts as they apply the more specific "Choice of Law Principles" outlined in section 6. The more specific "Choice of Law Principles" apply to all areas of law which determine choice of law through a most significant relationship test, not just to issues of tort.

*B. § 145 of the Restatement (Second) of Conflict—The General Tort Principle*

Section 145(1) lays out the basic principle for tort actions and section 145(2) lists four "contacts" that courts should consider in the course of applying the specific Choice of Law Principles under section 6. Section 145 of the Restatement (Second) of Conflict of Laws provides:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in §6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

14

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.

Section 145 advises that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

In this case, the court characterized the nature of the alleged tort as "the misappropriation of trade values." In keeping with the commentary to section 145, the court concluded that the "place of injury" should not play an important role in a case of this type as the plaintiff would normally feel the loss most acutely at his headquarters. *See* § 145(2) cmt. f. However, the district court largely ignored the remaining commentary under this section, which states that the "principal location of the defendant's conduct" is the single most important contact in cases involving misappropriation of trade values. [1] *Id.*

---

[1] Comments on subsection 2 indicate that the "place where the conduct occurred" will assume greater importance than the "place where the injury occurred" in certain situations. The situations cited include cases where the injury occurred in two or more states, where the place of injury cannot be ascertained or is fortuitous and bears little relation to the occurrence and the parties. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. subsection 2 (1971). Indeed, the comments note, the "place where the conduct occurred" assumes particular importance "in the case of torts involving interference with a marriage relationship or unfair competition since in the case of such torts there is often no one clearly demonstrable place of injury." *Id.*

On its face, Televisa's complaint would seem to present one of those cases in which a court would accord "the place where the conduct occurred" particular importance. The facts point to injury in two or more states (Mexico and Florida) and the injury that occurred in one of those states, Mexico, bears little relation to the defendants. Although the plaintiffs are based in Mexico, the defendants are based outside Mexico, in Florida, and they engaged in the alleged tortious conduct, for the most part, at their headquarters in Florida.

15

Although it noted that the alleged tortious conduct occurred in both Florida and Mexico, the court declined to make a finding as to the principal location of the defendant's conduct. While the facts do indicate that the defendants held one meeting with Islas' agent in Mexico, they held four such meetings with Islas and / or his representatives in Miami. The Florida meetings included: the initial contact between representatives of both parties; the first meeting between the parties that Islas attended directly, which defendants' in-house counsel and its CEO also attended; a second meeting between Islas and the defendants; and the meeting where Islas and the defendants entered into an exclusivity agreement; thereby, breaching Islas' pre-existing exclusivity agreement with the plaintiffs. The defendants also generated most of the written communications regarding Islas from their home offices in Florida.

Thus, the Florida contacts are both numerically and qualitatively more significant when it comes to determining the "principal location of the defendant's conduct." The record simply doesn't support the district court's decision to dismiss the significance of this point of contact or its failure to recognize that this contact pointed conclusively to Florida. Moreover, comment 'e' to section 145 (2) notes that "when the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance (see

Comment c).” *Id*. Although, Televisa argued that this was the primary purpose of Florida’s tortious interference rule, the court rejected this argument. The district court concluded that the primary purpose of the alleged tort was to protect property rights in contract, not to regulate conduct, as the plaintiffs asserted.

However, as comment ‘c’ in section 145(1) of the Restatement (Second) of Conflict of Laws notes, “[t]o some extent, at least, every tort rule is designed both to deter other wrongdoers and to compensate the injured person.” Florida’s law of tortious interference is clearly conduct-regulating on some level since the law allows for punitive damages, which are meant to punish wrongdoers. *See HGI Assocs. v. Wetmore Printing Co.*, 427 F.3d 867, 876-77 (11th Cir. 2005).

And, although Florida does not generally recognize punitive damages for breach of contract claims, it may recognize them “where the acts constituting a breach of contract also amount to a cause of action in tort.” *Id*. (citing *Griffith v. Shamrock Vill., Inc.*, 94 So. 2d 854, 858 (Fla. 1957)). In such cases, the underlying tort must be based on “an intentional wrong, willful or wanton misconduct, or culpable negligence, the extent of which amounts to an independent tort....” *S. Bell Tel. & Tel. Co. v. Hanft*, 436 So. 2d 40, 42 (Fla. 1983).

This is clearly the case with respect to Televisa’s complaint, which alleges an intentional tort. Persons who commit tortious interference with a contract desire,

or at the very least anticipate, certain consequences such as breach. By refusing to recognize that Florida's tortious interference rule is intended to regulate conduct, the district court undervalued the importance of the contacts relating to the place where the conduct causing the injury occurred.

With respect to the other contacts listed under section 145(2), the court found, quite correctly, that they were inconclusive for the purposes of determining choice of law in this case. Those contacts include: "the domicil, residence, nationality, place of incorporation and place of business of the parties,"§ 145(2)(c), and the "place where the relationship between the parties, if any, is centered," § 145(2)(d). Certainly, Televisa and Telemundo do not share any contacts in terms of domicil, nationality, place of incorporation. Moreover, the parties agreed that they share no relationship.[2]

*C. § 6 of the Restatement (Second) of Conflict—Specific Choice of Law Principles*

Having concluded that the section 145(2) contacts did not point conclusively to either Florida or Mexico for choice of law purposes, the district court examined

---

[2]The district court ventured to add, however, that the parties share a connection to Islas and the underlying contractual relationship that gives rise to the claim between Islas and Televisa.More significantly, perhaps, the record suggests that the two parties share in a business rivalry since their Spanish television programs are broadcast on competing stations in the United States. Although Televisa does not broadcast its productions in the U.S. directly, it does license them for broadcast through Univision, a corporation in which Televisa holds an unconsolidated equity interest. Univision operates two of the three Spanish language television networks that broadcast within the U.S., and Telemundo operates the other. Televisa also maintains its international sales office in Florida. Thus, to the extent that Televisa, through its licensee Univision, and Telemundo compete for a share of the Spanish television market, their business rivalry is arguably centered in Florida, and her sister states, but certainly not Mexico.

18

the section 6 factors to "resolve the standoff." Section 6 of the Restatement

(Second) of Conflict of Laws provides that, absent a statutory directive on a choice

of law, a state will consider the following factors for their relevance to the issue:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determinations of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(a)-(g) (1971).

The commentary to this section cautions that the factors are not listed in

order of relative importance and that varying weight will be given to particular

factors in different areas of law. *Id*. § 6(2) cmt. c. Unfortunately, the district court

weighed the various factors as though Televisa's tortious interference claim

sounded in contract law. Yet, as comment 'v' under section 766 of the Restatement

(Second) of Torts explains, a plaintiff may maintain an action against a third party

for tortious interference and a separate action against another party for breach of

contract. Both the breaching party and the party who induced that party to breach

his contract are wrongdoers and are liable to the plaintiff for harm. RESTATEMENT

(SECOND) OF TORTS § 766 cmt. v. (1979).

Moreover, under Florida law, a plaintiff can maintain a cause of action against a third party for tortious interference in a contract even though he might not be able to enforce the underlying contract. *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1344 (D. Fla. 2006) (citing *United Yacht Brokers, Inc. v. Gillespie*, 377 So. 2d 668, 672 (Fla. 1979)). This fact suggests that the terms of the underlying contract and the parties' expectations should have little bearing on the law that governs third party interference in that contract.

Nevertheless, the district court found that the "needs of the interstate and international forums," "the relevant policies of other interested states," "the protection of justified expectations," and "certainty, predictability and uniformity of result" all weighed heavily in favor of Mexico because the underlying contract was based there. It also found that application of Florida law would do nothing to advance the "relevant policies of the forum" because Florida's primary purpose in allowing tortious interference claims was to protect rights to performance of a contract.[3] When rights to the performance of a contract exist in another forum,

---

[3]The court cited *Smith v. Ocean State Bank,* 335 So. 2d 641, 642 (Fla. 1st DCA 1976) as support for this proposition, but the court appears to have read *Smith* too broadly. The appellant in *Smith* was suing a bank for interfering in an arrangement that he made to purchase silver with loan funds from the bank. Although the bank's note had not yet come due, the bank protested the proposed deal to the exchange and that ended it. The issue on appeal was whether the appellant had made out a claim for tortious interference in a business relationship because he had not asserted breach of an enforceable contract. The trial court ruled that he had not. The appellate court reversed the decision, ruling that a plaintiff could maintain a claim for tortious interference with a business relationship regardless of whether he had an enforceable contract or not. *Id.* The appellate court cited 45 AM. JUR. 2D *Interference* § 39, which states that the theory behind the doctrine of tortious interference "is that the right to perform a contract and to reap the profits resulting from such performance, and also the right to performance by the other

20

Florida has no interest in protecting such outside property rights, the court reasoned. Accordingly, the court concluded that Mexico represented the state with the most significant relationship to the parties and the occurrence.

We believe that the court overstated the extent to which the "needs of the interstate and international systems" favor the application of Mexican law in this case. Indeed, the court stated that those needs could only be met through the application of Mexican law since the contracting parties were both Mexican, the contract was to be performed in Mexico and Mexican law governed any contractual disputes. Applying Florida law in this case, the court reasoned, would undermine the international commercial system. In such a case, the parties would be exporting Florida law to control the rights and liabilities of a Mexican contract, the court concluded.

Televisa is not seeking to enforce its contract rights against Islas under Florida contract law, however. And, the Florida law that Televisa is seeking to impose will do nothing to effect its rights and liabilities under the Islas contract.

---

party, are property rights which entitle each party to protection against all the world, and to seek compensation by action in tort for any injuries to such contract. The interest protected has been said to be the right of the individual to security in his business relations, that is, the right to have preserved the undertaking of persons with whom he has commercial dealings." *Smith,* 335 So. 2d at 642. Thus, in *Smith*, the court was emphasizing the plaintiff's right to receive compensation for his injury —one of the purposes behind the tort, but not necessarily the only or even primary purpose behind the tort rule. The court did not hold that the primary purpose of the tort rule was to protect locally-based contracts or that Florida has no interest in regulating tortious interference within its borders per se. *Id*.
.

21

Televisa is seeking to apply Florida tort law that will compensate it for the losses caused by a third party's interference in the Islas contract. That third party is a corporate domiciliary of Florida and it allegedly used Florida as the venue for its tortious acts.

Denying Mexican businesses the right to sue Florida domiciliaries for tortious interference in their contracts would do little to "facilitate commercial intercourse" between Mexico and Florida. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. d (1971). The record indicates, for example, that Televisa maintains its international sales office in Florida. As the "Association of Producers and Distributors of Mexican Films" and the "National Chamber of Commerce for the Radio and Television Industries (of Mexico)" indicated in their amicus curiae brief, the district court's ruling would hinder the ability of Mexican companies to compete in the international marketplace. They argue that if the ruling were affirmed, it would be tantamount to granting Florida domiciliaries a safe haven from which to interfere in foreign contracts. Clearly, this would not serve the needs of the international systems.

The district court also appears to have accorded too much weight to what the "justified expectations of the parties" were, concluding that they weighed heavily in favor of Mexico. Granted, Televisa and Islas stipulated that Mexico's Federal

Copyright law would govern interpretation of the exclusivity contract and all disputes arising out of that contract. However, their agreement did not anticipate tortious interference by a third party. As the Florida Supreme Court pointed out when it contrasted contract actions and tort actions in *Sturiano v. Brooks*, 523 So.2d 1126, 1130 (Fla. 1988),"[w]ith tort law, there is no agreement, no foreseen set of rules and statutes which the parties had recognized would control the litigation."

We also note that intentional torts are not like negligent torts. When parties commit a negligent act, they give no thought to the legal consequences of their conduct or to the particular law that may apply. See RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2) cmt. g (1971). Intentional torts, however, presuppose a certain level of awareness, a recognition of potential consequences. As the facts demonstrate, Telemundo was aware that its actions were likely to induce Islas to breach his contract with Televisa and move to Florida where Telemundo films its productions. That was the objective.

Indeed, Telemundo had its legal counsel research the question of whether Televisa might be able to pursue a claim against it under Florida tort law. Although the parties' justified expectations may not be as pivotal a factor for determining

choice of law in torts issues as it is for contracts issues, to the extent that it figures in this case at all, we find that it points to Florida.

The district court also concluded that it could best assure "certainty, predictability and uniformity of result" by applying Mexican law. In doing so, it focused once again on the nature of the underlying contract as opposed to the nature of the alleged tort. Given that the plaintiffs are Mexican, and that they stipulated Mexican law should govern the underlying contract, the court opined, "if the law were equal in both states, [p]laintiffs would have filed in Mexico."

This assumes that the plaintiffs could have filed an action against the defendants in Mexico and simply want to avail themselves of more liberal recovery laws in a different forum. In such a case, a court could simply deny jurisdiction on the grounds of *forum non conveniens*. But there is nothing in the record to suggest that the plaintiffs could have filed this suit in Mexico. Mexican jurisdiction does not have the extra-territorial reach that the individual states enjoy in the U.S. Mexican law applies to all persons within the country and to all events that occur there. Federal Civil Code, Preliminary Provisions, Article 12 in: MEXICAN CIVIL CODE ANNOTATED. BILINGUAL EDITION. Translated by Professor Jorge A. Vargas. Thomson/West Publishing Co. 2005 at 3. The defendants committed their allegedly

tortious acts outside Mexico, and neither one of the defendants are Mexican corporations.

Moreover, to the extent that "certainty, predictability and uniformity of result" figure in this particular choice of law question, these factors favor the application of Florida law. The Restatement (Second) of Conflict of Laws states that "[p]redictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2) cmt. i (1971). This explains in part why the law allows parties "to choose the law that will determine the validity and effect of their contract." *Id*. The plaintiffs' action does not turn on the terms of its contract with Islas, however. Florida law would allow the plaintiffs to maintain a cause of action for tortious interference even if the Islas contract were voidable. *See, e.g.*, *Border Collie Rescue,* 418 F. Supp. 2d at 1344.

Rather, the plaintiffs' action turns on the conduct of entities that are not even parties to the contract. As we have noted, Telemundo recognized that Florida law might govern its conduct should it interfere in Televisa's contract with Islas and it chose to interfere, nonetheless. Thus, the defendants did give advance thought to the consequences of their actions and should not be surprised to find themselves liable under Florida law.

25

Finally, the district court found that the application of Mexican law could, conceivably, advance a Mexican policy interest relating to contracts, whereas the application of Florida law would do nothing to advance the policy interests of the forum. (Contrast RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (2)(c) with § 6 (2)(b)). This finding relies upon pure conjecture. The district court speculated that Mexico might have a policy of facilitating "efficient breach" of contracts, but did not cite a single legal authority in support of this proposition. Indeed, this Court refused to accept a "foreign investment interest" theory which one of the parties in *Cortes v. American Airlines, Inc.*, 177 F.3d 1272, 1301 (11th Cir. 1999), advanced under a choice of law analysis because the party did not present any evidence in support of the theory.

Although it was plausible that such a scheme could be designed to encourage non-domiciliary corporations to transact business within a jurisdiction, this Court observed in *Cortes*, "a party invoking the theory must adduce evidence to support the assumptions underlying the theory. ... In the absence of such evidence, the assumptions underlying this theory are 'too strained to merit serious weight under section 6(2)(c),'" *Id.* (quoting *Judge v. American Motors Corp*, 908 F.2d 1565, 1572-73 (11th Cir. 1980)).

Assuming, arguendo, that Mexico has a policy of facilitating "efficient breach," the crucial question is whether that policy would be advanced by application of its rule regarding tortious interference claims. [4] It is difficult to see how a hypothetical Mexican policy favoring "efficient breach" would be advanced by denying Televisa the right to obtain redress in Florida when a third party commits tortious acts in Florida that interfere with Televisa's Mexican contract.

Although Mexico might not have a policy that would be advanced by applying its law in this situation, Florida does. The district court found otherwise, but this finding proceeds from an overly broad reading of *Smith*. See *supra* note 3. As the preceding discussion on section 145(2) has noted, Florida has a strong interest in deterring tortious interference with contracts by those who operate inside the state's borders. See *supra* pp.17-18.

The final factor to be considered for determining the "most significant relationship" under section 6(2) is the "ease in the determination and application of the law to be applied." See RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(g) (1971). The court concluded that this factor favored Mexico because a

---

[4] *See*, *e.g.*, this Court's discussion in *Judge*, 908 F.2d at 1571, as to whether Mexico's prohibition against wrongful death claims might reflect an economic policy consideration. This Court theorized that the prohibition might reflect a desire to immunize certain socially useful enterprises from the "chilling" effect of adverse damage awards. Yet, the crucial question, this Court observed, was, "whether, on the facts of this particular case, Mexico's economic policy will be advanced by the application of its wrongful death prohibition." *Id*.

"Mexican plaintiff should look to Mexican law to remedy an interference with a Mexican contract." But such a comment ignores the difference between an action for breach of contract and one based upon the tort of deliberate interference with a contract. Nothing could be easier than for a court in Florida to apply Florida law to tortious conduct which took place in Florida.

## IV. CONCLUSION

We find that the factors to be considered in determining whether Mexico or Florida has the "most significant relationship" to the parties and the conduct alleged in this case tip the scales decidedly in favor of Florida. According to the commentary for section 145 of the Restatement (Second) of the Conflict of Laws, the "principal location where the defendant's conduct occurred" would be the single most significant "contact" in this type of case. The facts indicate that the "principal location" was the defendant's home base in Florida. The court declined to make a finding as to "the place where the conduct causing injury occurred." This led the court to conclude that none of the section 145(2) contacts pointed conclusively towards either Florida or Mexico. We find that the section 145(2) contacts point conclusively to Florida. This clear error skewed the district court's choice of law analysis against Florida.

28

The court also refused to recognize that Florida has an interest in deterring tortious interference with a contract per se, regardless of whether the underlying contract was made in Florida. This error also skewed the analysis against Florida. The court compounded this error by applying the choice of law factors outlined in section 6(2)(a)-(g) of the Restatement (Second) of Conflict of Laws as though the plaintiffs' claim sounded in contract. It focused too much attention on the terms of the Televisa-Islas contract, and the expectations that the parties had with respect to this contract, minimizing the independent significance of Televisa's tort claim against Telemundo. As a result, it accorded factors that could favor Mexico if this were, indeed, a conflict over contract law more weight than they deserved in this conflict involving tort law.

Accepting the underlying factors as considered by the district court, we conclude there was a misapplication of the controlling law. The authorities guiding a determination under a choice of laws issue compel a conclusion that this alleged tortious interference tort claim is governed by the substantive law of Florida. The summary judgment entered by the district court is vacated and the matter remanded for proceedings consistent with this opinion.

**REVERSED, VACATED, AND REMANDED.**