[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14107
Non-Argument Calendar
_____

D.C. Docket No. 1:18-cv-22208-UU

NEIMAN NIX,
DNA SPORTS PERFORMANCE LAB, INC.,

Plaintiffs - Appellants,

versus

ESPN, INC.,
THE ASSOCIATED PRESS, INC.,
USA TODAY,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 15, 2019)

Before WILSON, MARTIN, and NEWSOM, Circuit Judges.

PER CURIAM:

This appeal arises out of a defamation action brought by Neiman Nix and

DNA (collectively, Appellants) against three media companies (collectively,

Appellees) who published or republished a news article reporting on a lawsuit that Nix filed against the MLB. The Appellees filed a motion to dismiss and asserted several defenses. The district court applied New York law and dismissed the case with prejudice. Appellants now appeal, arguing that the court erred in (1) deciding to apply New York law, (2) determining that the fair report privilege and wire service defenses warranted dismissal, and (3) concluding that the statements at issue in the articles were true and did not have a defamatory implication. We disagree with Appellants and affirm.

I.

In 2012, Nix opened a sports training center, DNA Sports Performance Lab, Inc., in Florida. In addition to providing training services, DNA sells health supplements, including a supplement derived from elk antler tissue that contains a naturally occurring compound called IGF-1. DNA claims that the supplement has many health benefits that improve athletic performance.

In 2013, the MLB launched an investigation into the illegal sale of performance enhancing drugs to MLB players. The investigation targeted clinics in Florida, including DNA. Nix filed a tortious interference suit against the MLB in the Southern District of New York for harm to his reputation resulting from the investigation. On the same day, the Associated Press (AP) published a news article about Nix's lawsuit against the MLB. ESPN and USA Today then republished the

2

reported information in their own articles. Each article contained the following statement about Nix's suit against the MLB: "The suit admits Nix and his company used bioidentical insulin like growth factor (IGF-1), which is derived from elk antlers and is on baseball's list of banned substances."[1]

Twenty months later, Appellants sued all three media companies in Florida state court, seeking injunctive relief via removal or retraction of the articles and damages for defamation and intentional infliction of emotional distress. Appellees successfully removed the case to federal district court. Appellants alleged that the statement about Nix's ongoing suit against the MLB was incorrect and falsely suggested that he sold banned substances to MLB players. Furthermore, Appellants contended that the statement did not distinguish between natural and synthetic forms of IGF-1, and thus wrongly implied that Appellants sold illegal drugs, or legal drugs in an illegal manner.

Appellees moved to dismiss the complaint, and the district court granted dismissal with prejudice. The district court applied New York law, determining that (1) Appellants' defamation claim was barred by New York's one year statute of limitations, (2) the Appellees' statements fell within New York's absolute fair report privilege, (3) ESPN and USA could successfully apply a wire service

---

[1] The MLB Prohibited Substances List includes "Insulin-like Growth Factor (IGF-1), including all isomers of IGF-1 sometimes referred to as Mechano Growth Factors." The description does not include the source of the substance or limit the prohibition to synthetic IGF-1.

defense, and (4) Appellees' statements were true and thus not defamatory. Appellants now appeal, asserting that the district court wrongly applied New York law in dismissing this case. Appellants further assert that the district court erred in determining that the fair report privilege and wire service defenses warranted dismissal of its defamation claims. Finally, Appellants argue that the district court erred in determining that the statements at issue were true and could not plausibly be interpreted to have a defamatory implication.

## II.

We review the grant of a motion to dismiss de novo, "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1296–97 (11th Cir. 2015) (quoting *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003) (per curiam)). We review a choice of law determination de novo and review the factual findings underpinning that determination for clear error. *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1239 (11th Cir. 2007).

"A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state" based on the particular legal issues in the case. *Id.* at 1240. When faced with a conflict of laws in a torts case, Florida courts apply the "most significant relationship" test outlined in the Restatement (Second) of Conflict of Laws § 145. *Id.* The test lists four factors that courts must consider with respect to

4

each claim: (1) the place where the injury occurred; (2) the place where the

conduct causing the injury occurred; (3) the domicile, residence, nationality, place

of incorporation, and place of business of the parties; and (4) the place where the

relationship, if any, between the parties is centered. *Id.* "These factors are

considered according to their relative importance with respect to the particular

issue." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016) (internal

quotation marks omitted). If the court cannot draw a conclusion based on these

four factors, it may then consider the seven factors outlined in the Restatement

(Second) of Conflict of Laws § 6.[2] *Grupo Televisa,* 485 F.3d at 1240. The seven

factors are not exclusive and the court may give different weight to particular

factors, or consider other factors in deciding a question of choice of law.

Restatement (Second) of Conflict of Laws § 6 (1971).

The Restatement (Second) of Conflict of Laws § 150 also states that when

defamatory information is published in more than one state, the "state of most

significant relationship" will usually be the state where the plaintiff was domiciled

or had its principal place of business at the time. This is premised on the notion

that the plaintiff will usually suffer greatest injury—by reason of loss of

reputation—in the state of domicile or principal place of business. There are

---

[2] These seven factors include: (1) the needs of interstate and international systems; (2) relevant policies of the forum; (3) relevant policies of other interested states and the relative interests of those states in the determinations of the particular issue; (4) protection of justified expectations; (5) basic policies underlying the particular field of law; (6) certainty, predictability and uniformity of result, and (7) ease in the determination and application of the law to be applied.

situations, however, in which the state of most significant relationship is not where the plaintiff was domiciled or had its principal place of business, but rather the state where the plaintiff suffered greater injury. For example, a plaintiff may suffer greater injury in another state if the defamatory matter "related to an activity of the plaintiff that is principally located in [that] state," or "the plaintiff suffered greater special damages in [that] state than in the state of his domicil." *Id.*; *see also Michel*, 816 F.3d at 694 (applying New York law in a defamation suit brought by a Florida resident in part because "the article was published in New York, regarding an event that took place in New York, and that allegedly caused harm to [plaintiff's] business interests in New York," and "[all defendants] are domiciled in New York.").

## III.

In the present case, there is a conflict of laws with respect to affirmative defenses to defamation asserted by Appellee AP. First, Appellees assert that Appellants failed to bring their defamation claim within the one year statute of limitations under New York law. N.Y. C.P.L.R. 215(3) (McKinney 2006). This claim would have been timely under Florida law, which provides two years to bring a defamation claim. Fla. Stat. § 95.11(4)(g) (West 2018). Second, Appellees assert that the fair report privilege applies. Florida law recognizes only a qualified fair report privilege. *See Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501,

6

502 (Fla. 3d DCA 1993). In contrast, New York law recognizes an absolute fair report privilege which may serve as a basis to dismiss a complaint at the pleading stage. *See Cholowsky v. Civiletti*, 69 A.D.3d 110, 114 (N.Y. App. 2009) (recognizing absolute fair report privilege for judicial proceedings); *Adelson v. Harris*, 973 F. Supp. 2d 467 (S.D.N.Y. 2013), *aff'd* 876 F.3d 413 (2d Cir. 2017) (same).[3]

The district court applied Florida's four-factor "most significant relationship test" to conclude that New York law applied. The court determined that the first factor of the test—the place where the injury occurred—weighed "somewhat" in favor of New York. The allegedly defamatory information was published online and accessible anywhere but caused the greatest injury in New York. Appellants generally alleged injuries in both New York and Florida, but Appellants only alleged specific injuries in New York. In particular, the allegedly defamatory information from the articles was used against Nix in a lawsuit in New York and obstructed Appellants' attempt to expand their business to Manhattan. We agree with the district court's factual findings and application of the first factor.

The court then determined that the second factor—the place where the conduct occurred—also weighed "somewhat" in favor of New York. Once again, although the articles were published online and accessible anywhere, the decision

---

[3] Because we agree with the district court's application of New York law, we will not evaluate whether Florida's qualified fair report privilege would have served as a successful defense here.

7

to publish the allegedly defamatory information was first made by Appellee AP, which is headquartered in New York. We agree that this weighs only somewhat in favor of New York.

The court then determined that the third factor—the location of the parties—was "neutral" because all parties were from different locations. All Appellees were incorporated in different states, and the district court made a factual determination that Appellants' locations were uncertain and thus could not provide weight for any particular state.

Appellants argue that the district court did not correctly determine the location of the parties and did not give enough weight to the fact that both Appellants were located in Florida. Appellants assert that, had the court properly recognized that both Appellants were located in Florida, the court would have found that Florida was the state of most significant relationship, because it was the state of both Appellants' respective domiciles and DNA's principal place of business. The court, however, found that the Appellants' respective locations were uncertain because Appellants did not clearly allege in their complaint that Florida was Nix's domicile or DNA's principal place of business. The complaint never stated that Nix was a citizen of, or residing in, Florida; and although the complaint

8

did state that DNA was a "Florida corporation," Appellants never alleged in their complaint that Florida was DNA's principal place of business.[4]

Appellants later attached an affidavit in response to Appellees' motion to dismiss, alleging that Nix had been domiciled in Florida at all relevant times. The district court noted that Appellants could not amend their complaint through this response. The court further added that Nix had alleged permanent residence in Texas when he filed suit against the MLB in the Southern District of New York, suggesting that he might be lying about his domicile in at least one of his suits.

The district court did not clearly err in its factual findings with respect to the location of the parties. The court could have found that DNA, a "Florida corporation," was located solely in Florida. However, the Appellants did not write in their complaint that DNA's principal place of business was in Florida. The complaint also failed to state that Nix was domiciled in Florida. The district court thus concluded that Appellants' locations were uncertain, especially in light of additional information suggesting that Nix may have been in Texas when the allegedly defamatory information was published. If Nix were in Texas, then all parties would be from different locations at the time of suit. This was not a clearly

---

[4] The complaint states that Nix started his first business in Seattle, Washington and this business expanded to Clearwater, Florida. Nix then "launched a new business in the form a [sic] state-of-the-art sports science center in Miami Beach, Florida in April of 2012." This new business was DNA. The complaint never clearly states that Florida was DNA's principal place of business, nor does it provide any further information to support such a claim.

9

erroneous factual finding, and the court properly applied the relevant legal factor to this finding, ultimately concluding that the factor was of "neutral" weight.

Finally, the district court determined that the fourth factor—the relationship of the parties—was of neutral weight because the parties did not allege any relationship outside of the defamation suit. The district court also appeared to give some weight to one of the seven factors listed in the Restatement (Second) of Conflict of Laws § 6, noting that New York had an interest in determining the application of affirmative defenses to litigation. Many of the factors listed in § 6 do not weigh heavily in favor of either state; thus, they are not particularly useful in determining which state law to apply. Considering the totality of these factors, it appears that the test weighs somewhat in favor of New York law.

After applying the "most significant relationship" test, the district court correctly determined that New York law applied to the two affirmative defenses. The court first applied New York's one year statute of limitations to Appellants' defamation claim, starting on the date of "the first publication of the defamatory statement," and concluded that Appellants had brought the claim eight months too late. *See Firth v. State*, 775 N.E.2d 463, 464–65 (N.Y. 2000). We therefore affirm the district court's dismissal of Appellants' defamation claim on this ground.

The district court also applied New York law to Appellees' fair report privilege defense. Under New York law, "[a] civil action cannot be maintained

10

against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding . . . ." N.Y. Civ. Rights Law § 74 (McKinney 2019). A report is "fair and true" within the meaning of this statute if "the substance of the article [is] substantially accurate." *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 217 (E.D.N.Y. 2012). "A report is 'substantially accurate' if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Zerman v. Sullivan & Cromwell*, 677 F. Supp. 1316, 1322 (S.D.N.Y. 1988).

When the parties submit allegedly defamatory information to a court, that court "may determine as a matter of law whether allegedly defamatory publications are 'fair and true' reports of official proceedings." *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 457 (E.D.N.Y. 2013). Reports "must be accorded some degree of liberality," and if it is not misleading and is "composed and phrased in good faith under the exigencies of a publication deadline," the report should not be "parsed and dissected on the basis of precise denotative meanings which may literally, although not contextually, be ascribed to the words used." *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 399 N.E.2d 1185, 1187 (N.Y. 1979). "It is sufficient that the plaintiff's complaint or documents referred to therein form the basis for each of the contested statements."

11

*D'Annunzio*, 876 F. Supp. 2d at 217–18.  Statements in a report will not be protected, however, if they "imply misconduct beyond that alleged in the judicial proceeding on which the report is based." *Id.*

In the present case, Appellants submitted the allegedly defamatory statement to the district court in their complaint.  The allegedly defamatory statement describes a suit that Nix brought against the MLB in the Southern District of New York.  The statement reads: "The suit admits Nix and his company used bioidentical insulin like growth factor (IGF-1), which is derived from elk antlers and is on baseball's list of banned substances."  In his suit against the MLB, Nix alleged in his complaint that "[o]ne of the main ingredients used by Nix and DNA Sports Lab come [sic] from Bio-identical Insulin like Growth Factor ("IGF-1"), which is derived from elk antlers."

Nix also included in that complaint language from MLB's publicly available list of banned substances.  Specifically, the relevant language included: "Any and all anabolic androgenic steroids covered by Schedule III of the Code of Federal Regulations' Schedule of Controlled Substances ("Schedule III"), as amended from time to time*, and the categories of hormones and agents with antiestrogenic activity that are set forth in Nos. 67–74*, below, shall be considered Performance

12

Enhancing Substances covered by the Program."[5]  IGF-1 appears at *Number 68* on that list, and is described as "Insulin-like Growth Factor (IGF-1), including *all isomers of IGF-1* sometimes referred to as Mechano Growth Factors."  Although Appellants seek to distinguish between natural and synthetic IGF-1, the MLB's list does not make such a distinction.

Nix's complaint in his suit against the MLB stated that his products contained IGF-1 derived from elk antlers.  The MLB's list of banned substances includes all isomers of IGF-1.  The statement at issue simply combined these two facts.  The district court correctly concluded, based on this information, that Appellees' statements were substantially correct, and fell within the protection of the fair report privilege.

## IV.

Appellants also argue that the wire service defense should not protect Appellees ESPN or USA Today, the republishers of AP's original statement.  Both Florida and New York law provide that, when one news agency "republishes the content of a news story that was originally published by another reputable news agency or source," the republisher will not be liable if they relied "on the research

---

[5] Appellants contend that natural IGF-1 is not a Schedule III Controlled Substance, and therefore does not fall within the MLB's list of banned substances.  Appellants ignore, however, the italicized language immediately following the sentence about Schedule III Controlled Substances.  The italicized language makes clear that the list of banned substances includes hormones and agents with antiestrogenic activity described in numbers 67–74.  All isomers of IGF-1, described in number 68 on the banned substances list, fall into this category of banned substances.

of the original publisher, 'absent a showing that the republisher had, or should have had, substantial reasons to question the accuracy of the articles or the *bona fides* of [the] reporter.'" *Rakofsky v. Washington Post*, 2013 WL 1975654, *12 (N.Y. Sup. Ct. April 29, 2013); *Layne v. Tribune Co.*, 146 So. 234, 238–39 (Fla. 1933); *see also Miami Herald Pub. Co. v. Ane*, 458 So. 2d 239, 242 (Fla. 1984) (summarizing *Layne*'s conclusion that a newspaper's "privilege to publish an apparently authentic news dispatch received from and attributed to a generally recognized reputable news service agency (such as the Associated Press or Universal Press) in the absence of a showing that the publisher acted in a "*negligent*, reckless, or *careless* manner").

Here, AP—a reputable news source—published an article with a statement that was a substantially accurate summary of judicial proceedings. Appellants did not assert facts to show, and there is nothing else to suggest, that ESPN or USA Today were negligent, reckless, or careless in relying on AP's content. The district court thus correctly concluded that the republishers of this statement—ESPN and USA Today—prevail on their wire service defenses.

V.

Finally, Appellants assert that the district court erred as a matter of law in determining that Appellees' statements were not defamatory. "True statements, statements that are not readily capable of being proven false, and statements of

14

pure opinion are protected from defamation actions by the First Amendment."
*Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). "Whether the statement is
one of fact or opinion and whether a statement of fact is susceptible to defamatory
interpretation are questions of law for the court." *Id.* at 1262–63. In *Turner v.
Wells*, we rejected a plaintiff's claim of defamation by implication, emphasizing
that courts afford news media editorial discretion. *Id.* at 1269.

If a defendant "juxtaposes a series of facts so as to imply a defamatory
connection between them, or creates a defamatory implication by omitting facts, he
may be held responsible for the defamatory implication, unless it qualifies as an
opinion, even though the particular facts are correct." *Id.* A statement "is not
considered false unless it 'would have a different effect on the mind of the reader
from that which the pleaded truth would have produced.'" *Masson v. New Yorker
Magazine, Inc.*, 501 U.S. 496, 517, 111 S. Ct. 2419, 2433 (1991).

Appellants allege that the Appellees published or republished statements that
did not specify whether Appellants sold synthetic or natural IGF-1, and this
omission implied that Appellants sold illegal drugs. But the alleged omission did
not make the statements untrue. The statements accurately reported available
information without creating a defamatory implication. Appellants admit that they
sell IGF-1, which is derived from elk antlers. The MLB Prohibited Substances List
includes "Insulin-like Growth Factor (IGF-1), including all isomers of IGF-1

15

sometimes referred to as Mechano Growth Factors." The List does not describe the source of the substance or distinguish between synthetic and natural IGF-1. Therefore, the omission of any distinction between synthetic and natural IGF-1 does not render the statements untrue or defamatory.

Appellants also argue that the articles included references to an ongoing MLB drug use scandal and to a lawyer who defended an MLB player who had tested positive for illegal substances several times, which created a defamatory implication in combination with the other facts provided. The drug scandal was discussed extensively in Appellants' complaint upon which the articles were reporting, and the complaint was filed by the lawyer referred to in the articles. The articles did not imply a defamatory connection between these facts and the fact that Appellants sold IGF-1.

## VI.

We conclude that the district court did not err in applying New York law to the statute of limitations and fair report privilege defenses. Both defenses served to defeat Appellants' defamation claims here. Furthermore, the district court correctly determined that ESPN and USA Today's wire service defenses warranted dismissal, and finally that the statements at issue were true and lacked a defamatory implication. Accordingly, we affirm.

**AFFIRMED**.

16